## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARIO DIBATTISTA, derivatively on behalf of ADVANCE AUTO PARTS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| THOMAS R. GRECO, THOMAS OKRAY, JEFFREY C. SMITH, JOHN F. BERGSTROM, BRAD W. BUSS, JOHN F. FERRARO, ADRIANA KARABOUTIS, and EUGENE I. LEE, JR., | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ADVANCE AUTO PARTS, INC. | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# KEY TERMS[1]

| Term | Meaning |
|---|---|
| Advance Auto or AAP or the Company | Advance Auto Inc. |
| AOP | AAP's Annual Operating Plan |
| Blue | Internal nickname for Carquest stores' and distribution centers' distinct legacy IT system |
| Claw Back Spreadsheet | A spreadsheet, personally created by Greco, which calculated, among other things, how many additional sales were needed to get back to AOP |
| Class Period | November 14, 2016 through August 15, 2017 |
| Comp store sales | Comparable Store Sales |
| DC | Distribution Center |
| DIFM or Professional | Professional installer customers |
| DIY | "Do-it-yourself" retail customers |
| DM | District Manager |
| FE(s) | Former employee(s) of AAP |
| Finance Team | AAP's FP&A team, with primary responsibility for forecasting |
| FY17 Guidance | AAP's 2017 Full Year Assumptions, which the Individual Defendants offered to investors in November 2016, and reaffirmed in February 2017 |
| Greco Forecasts | A second, more aggressive set of forecasts, generated by Operators at Greco's command |

[1]       The "Key Terms" defined herein are the same "Key Terms" with the same definitions as those set forth in the Amended Class Action Complaint For Violations of the Federal Securities Laws filed on January 25, 2019 in the securities fraud class action pending in this Court captioned *In re Advance Auto Parts, Inc. Sec. Litig.*, Civ. No. 18-212-RGA.

| Integration Meetings | Monthly meetings, attended by SVPs and others, to discuss the GPIO integration's progress |
|---|---|
| Red | Internal nickname for AAP stores' and distribution centers' distinct legacy IT system |
| Results Meetings | Weekly in person meetings with defendants Greco, Okray, and other executives, at which attendees discussed sales performance, trends, and the reasons for the Company's negative results, held on Mondays in the Company's Raleigh, North Carolina office |
| RVP | Regional Vice President |
| RVP Call | Weekly call between SVPs and their respective RVPs to discuss sales and target, held at 10 am on Mondays |
| Starboard Agreement | Agreement with Starboard to implement a host of changes to meet the activist investor's demands, announced November 12, 2015 |
| SVP | Senior Vice President |
| SVP Call | Weekly call with CEO and his team with SVPs to discuss sales and targets |

Plaintiff Mario DiBattista ("Plaintiff"), by and through his undersigned counsel, brings this action derivatively on behalf of nominal defendant Advance Auto Parts, Inc. ("AAP" or "Advance Auto" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and unjust enrichment. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, statements made by the Company and the Individual Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AAP, news reports, securities analysts' reports, court filings in related civil lawsuits, advisories about the Company, and information readily obtainable on the Internet. Plaintiff

believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.    INTRODUCTION

1.    This is a shareholder derivative action brought for the benefit of nominal defendant AAP against certain of its current and/or former officers and directors based on their breaches of fiduciary duty and other serious misconduct as alleged in detail herein.

2.    This derivative action is based on a scheme perpetrated by the Individual Defendants, who issued a series of false and misleading statements beginning in November 2016 in which they published guidance for the Company's 2017 financial performance ("FY17 Guidance") they knew was unattainable, and which directly contradicted contemporaneous internal forecasts.[2]

3.    When the Individual Defendants were forced in mid-August 2017 to finally "come clean" and revise the Company's previously issued false FY17 Guidance, AAP's stock plummeted by over *20%* in one day.

4.    As a result, a securities fraud class action captioned *In re Advance Auto Parts, Inc. Sec. Litig.,* Civ. No. 18-212-RGA (the "Securities Action") was subsequently initiated in this Court in 2018 against the Company and certain of the Individual Defendants, including Thomas R. Greco ("Greco") and Thomas Okray ("Okray").

5.    The allegations in the operative complaint in the Securities Action are based on, among other things, the accounts of twenty-one (21) confidential witnesses, all of whom are former AAP employees.[3]

---

[2]    AAP's fiscal year is the same as the calendar year, January through December.

[3]    All allegations herein referencing the accounts of confidential witnesses, or "FEs" are based on those accounts as they appear in the Amended Class Action Complaint For Violations of

6.      As discussed further herein at length, on February 7, 2020, class action claims for violations of the federal securities laws were sustained by this Court in the Securities Action against AAP, and defendants Greco and Okray, notwithstanding the materially heightened pleading standards applicable to the Securities Action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

7.      Defendant Greco, a director of AAP and the Company's President and Chief Executive Officer ("CEO"), and defendant Okray, the Company's former Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), were among a slate of handpicked executives installed at AAP by activist investor Starboard Value LP ("Starboard"), which in 2015 had acquired a $460 million stake in AAP and publicly pronounced it could turn AAP around. Starboard claimed that, if given the opportunity to install its own slate of managers and directors, it could double AAP's stock price to more than $350.

8.      Buying in, AAP's Board quickly capitulated.  Defendant Jeffrey C. Smith ("Smith"), Starboard's CEO, took over as Chairman of AAP's Board and installed defendant Greco, a former potato chip executive from Frito-Lay, Inc., as the Company's new CEO.

9.      As alleged in the Securities Action based on the accounts of confidential witnesses, the Individual Defendants ignored the internal projections prepared by AAP's experienced Finance Team and invented an earnings scenario and a set of targets with no basis in reality.  Based on these targets, the Individual Defendants reaffirmed the FY17 Guidance repeatedly, despite overwhelming evidence that meeting such guidance would be impossible.

the Federal Securities Laws (the "Securities Complaint"), filed in the Securities Action on January 25, 2019.

10.     On August 15, 2017, the Individual Defendants finally rescinded the false guidance that had propped up AAP's stock price for months. As the truth about AAP's financial performance and the status of the Individual Defendants' purported turnaround campaign for AAP was revealed, AAP's stock collapsed, losing more than 20% of its value in one day on August 15, 2017.

11.     AAP is a leading automotive aftermarket parts provider in North America that serves both professional installers ("DIFM" or "Professional") and "do-it-yourself" ("DIY") retail customers.   Since 2008, the Company has invested significantly in increasing Professional sales— by far the most lucrative part of its business—at a faster rate, fueled in large part by a series of major acquisitions.

12.     On October 16, 2013, in its highest profile addition to date, AAP announced that it was acquiring General Parts International, Inc. ("GPI"), a privately held company specializing in the Professional space, for $2.04 billion. The move was immediately heralded as "transformative"; a "game changing acquisition, which, by combining the #3 [AAP] and #4 [GPI] player in the industry by sales, ***immediately creates the market leader***."4   Following the announcement, AAP's shares rose as much as 24%, reaching a then-all-time high.

13.     Despite the market's initial enthusiasm, the synergies AAP hoped to realize from the acquisition failed to materialize.  From 2014 through most of 2015, the Company's comparable store sales ("comp store sales") and operating margins—its two most closely watched metrics—stagnated and even declined.

14.     Internally, the reasons for the stagnant growth were widely understood as tied to the struggle to consolidate the IT operations of the new acquisition's crown jewel—

_____

4      Unless otherwise noted, all emphasis is added.

Carquest— with those of AAP.  According to the accounts of confidential witnesses as set forth in the operative complaint in the Securities Action, AAP's and GPI's extensive computer infrastructures were completely incompatible.  Work-arounds that aimed to achieve synergies in inventory management and supply chain failed.  In September 2015, two years after the GPI acquisition, AAP was still struggling to reap the benefits of the deal, and its stock price had sunk from the slowdown in its year-over-year ("YOY") growth.

15.     Then—fresh off a string of takeover successes and sensing an opportunity for a quick profit—activist investor Starboard began its coup. On September 30, 2015, Starboard announced it had acquired a 3.7% stake in the Company, worth roughly $460 million.  Led by defendant Smith, Starboard's CEO—dubbed the "most feared man in corporate America"— Starboard laid out an ambitious plan to accelerate the GPI integration, slash costs, and improve margins by 600 to 750 basis points.

16.     Starboard also promised to return significant capital to shareholders in the form of stock buybacks and dividends.  Following Starboard's announcement, shares of AAP soared nearly $20, or 11%.

17.     Over the next year, Starboard set about taking control of AAP's senior management team and the Board.  Starboard installed Smith as Chairman of the AAP Board, along with four additional handpicked Board members.   The Company's former CEO, President, and CFO were pushed out, and Starboard installed senior executives of its own choosing, including defendants Greco and Okray.

18.     But the problems plaguing AAP were not susceptible to the quick fix that Starboard envisioned and touted when it sought control of the Company.  Over a year into its investment and six months after taking control of AAP, the Company reported successive

quarters of disappointing earnings and negative comp store sales. By November 4, 2016, AAP's stock had declined over 20%, to approximately $135 per share, since a year earlier when Starboard had made its investment at approximately $171 per share.

19.     Eager to turn a profit on Starboard's large investment and reverse AAP's sagging stock price, the Individual Defendants looked to change the narrative surrounding the Company. On November 14, 2016, defendant Okray announced to the market, unequivocally: "*[f]or 2017, we will deliver positive sales comp growth and a modest increase on operating margin.*" Greco later exclaimed: "*we're excited about our comp prospects for the next year, very excited about it*." The Individual Defendants further promised *500 basis points* of margin expansion—or $500 million in gross productivity—by 2021. Greco added, "the bottom line here is that our changes are leading to increased sales, lower costs, lower inventory levels, and higher customer satisfaction." The market was immediately impressed. AAP's stock shot up nearly 15% on this news.

20.     Three months later, the Individual Defendants reaffirmed their promise to the market. On February 21, 2017, the Individual Defendants promised comp store sales growth of *up to 2%* and *35 basis point improvement* in operating margin. Despite the Company's lackluster results, which were reported at the same time, investors were assuaged by the Individual Defendants' full year assumptions. The message was clear: the Individual Defendants had a clear path to deliver results.

21.     But the promise of a turnaround was a mirage. Indeed, according to allegations based on the accounts provided by multiple confidential witnesses in the Securities Action, the GPI integration was marred by setback after setback. Most critically, with no way for AAP's and GPI's IT systems to speak with one another, and no plan in place for how to rectify the

problem, the Company struggled to get parts to customers on time and to maintain appropriate inventory levels in its distribution centers ("DCs").

22.     Rather than reckoning with the technical challenges facing the Company— which required millions of dollars of IT investment—Starboard insisted on dramatic cost-cutting in an effort to quickly juice margins, but which could not deliver the increased sales Starboard touted to the market.  Starboard made drastic labor cuts and took away Company phones and cars. Stores that were not meeting their sales targets were told to send employees home without pay.  DCs were undermanned. Resources were so strained that sales managers were forced to make deliveries themselves.  With AAP's work force depleted and its brand eroding, disenchanted customers left *en masse* beginning in 2016 and continuing thereafter.

23.     Starboard's cost-cutting exacerbated sales declines—a fact which was immediately apparent in the Company's internal projections.  In August 2016, the Company's own Finance Department was forecasting gross sales growth of ***negative 3%*** for 2017.  As alleged in the Securities Action, these forecasts, along with others, were shared with certain of the Individual Defendants during weekly "Results Meetings." By December 2016, the Finance Department's forecasts had dropped to ***negative 4% to 5%***.

24.     Unsurprisingly, and as alleged in the Securities Action based on the accounts of numerous confidential witnesses, the Company's performance leading up to November 2016 and thereafter was abysmal:

- According to defendant Greco's personally created "Claw Back Spreadsheet", which calculated how many additional sales were needed to get back to Advance Auto's Annual Operating Plan ("AOP") all Regional Vice Presidents ("RVPs") were in "***Negative Comp Status***" during 2016 and 2017.

- Quarterly forecasts showed that by 4Q16, the Company was missing its operating margin target by the ***largest gap*** as compared to any point earlier in the year, and continued to miss its margin AOP by ***double digit***

*basis points* into the first and second quarters of 2017 ("1Q17" and "2Q17," respectively).

- One commercial sales manager's territory alone—which included parts of Ohio, Pennsylvania and New York—was *$20 million below AOP* going into March 2017.

25.    Nonetheless, in the face of these facts and actual internal projections, the Individual Defendants continued to mislead the public, insisting that their turnaround efforts were working and that the Company would deliver on the previously issued FY17 Guidance.

26.    By the time the Individual Defendants caused the Company to report its 1Q17 results on May 24, 2017—including comp store sales of *negative 2.7%*—analysts began to question how they reconciled with the Individual Defendants' optimistic guidance laid out in November 2016 and February 2017. In response, the Individual Defendants lied, blaming the Company's poor results on the "weather" and assuring investors they had "*seen a dramatic improvement in our comps*" over the past several weeks. But according to the account of one of the confidential witnesses in the Securities Action, an RVP, "*[w]hatever they said to Wall Street was not real*."

27.    What's more, when analysts pressed the Individual Defendants on the FY17 Guidance, they reaffirmed that AAP would meet the guidance.  For example, defendant Greco publicly stated that the guidance "*stands as we sit here today*," while defendant Okray maintained, "*[w]e're not going to change guidance in fiscal year '17*." Although the poor 2017 first quarter performance was a manifestation of the misleading guidance issued in November 2016 and February 2017, and the Company's stock price fell by over 5% in response to the guidance miss, the Individual Defendants continued to mislead the public and reassure investors.

28.     Indeed, at the same time the Individual Defendants were reaffirming their February 2017 guidance in May 2017, it was being acknowledged internally at the Company that earnings were a "disaster," according to the account of one confidential witness (identified in the operative complaint as "FE 8") in the Securities Action.  So much so that, according to that same confidential witness account provided by FE 8, this prompted a Board meeting during which the Board specifically discussed with defendants Greco and Okray whether the Company should issue revised, corrected guidance given the disastrous internal projections. The Individual Defendants, however, ultimately did not issue revised guidance.

29.     Notably, defendants Greco, Smith, John F. Bergstrom ("Bergstrom"), Brad W. Buss ("Buss"), John F. Ferraro ("Ferraro"), Adriana Karaboutis ("Karaboutis"), and Eugene I. Lee, Jr. ("Lee") – certain of whom were installed on the Board by Starboard, and who together make up a majority (7 out of 11) of the members of AAP's current Board – were members of the Board in the Fall of 2016 and Spring of 2017.

30.     Just three months later, facing another quarter of dismal results, the Individual Defendants were forced to finally revise the false guidance.  They revealed that comp store sales for 2017 would in fact be ***negative 1% to 3%***, and margins would ***decrease by 200 to 300 basis points***. In explaining the miss, defendant Greco did not mince words: "***[w]e lacked a coherent strategy***. Our frontline turnover was ***unacceptable***. Our technology platforms were ***segregated and difficult to navigate***. And our supply chain infrastructure was ***duplicative and siloed***."

31.     As the market absorbed the reality that the purported rapid turnaround promised by Defendants in November 2016, reaffirmed in February 2017 in optimistic guidance, and again endorsed in May 2017, was illusory, AAP's stock collapsed.  On August 15, 2017, ***$1.64***

*billion* in market capitalization was erased, as AAP stock fell from $109.32 to $87.08 per share, or more than *20%*.

32.     Based on these events, in 2018 the Securities Action was initiated in this Court on behalf of a class of AAP investors who purchased AAP common stock from November 14, 2016 through August 15, 2017 (the "Class Period").  On February 7, 2020, this Court sustained claims in the Securities Action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against AAP and defendants Greco and Okray.

33.     In sustaining (in substantial part) the Exchange Act claims asserted in the Securities Action against AAP, Greco, and Okray, this Court concluded that the allegations in the Securities Complaint were sufficient "to support an inference of scienter" as to certain public statements issued during the Class Period, specifically on November 14, 2016, February 21, 2017, and May 24, 2017.  Those public statements included:

- Okray's statement in a November 14, 2016 conference call with investors and analysts that "For 2017, we will deliver positive sales comp growth and a modest increase in operating margin."

- The Company's February 21, 2017 press release stating that for 2017, AAP's comparable store sales will grow between "0% to 2%" and adjusted operating income will "improve[]" by "15 to 35 basis points."

- Okray's statement in a February 21, 2017 conference call with investors and analysts that the Company "expect[s] to deliver comparable store sales in the range of 0% to 2% and store sales in the range of 0% to 2% and an adjusted operating margin increase between 15 points to 35 basis points for the year."

- Greco's statement during that same February 21, 2017 conference call that "we plan to accelerate sales growth to above the industry average, and we're going to close the margin gap versus our competition."

- Greco's statement during a May 24, 2017 conference call with investors and analysts "[t]hat [FY17 projections] stands as we sit here today."

- Greco's statement during that same May 24, 2017 conference call that "we remain confident with the progress we're making as we execute our

plan and expect sales and customer momentum to continue with more operating leverage as we enter the back half of 2017."

- Greco's comment on the "soft patch" in sales compared to prior quarters during that same May 24, 2017 conference call, and statement that "[e]verything we look at says this was a blip, not a trend."

- Okray's statement during that same May 24, 2017 conference call that "we're not going to change guidance [i.e., projections] in fiscal year '17. We're comfortable with the outlook for [adjusted operating income] that we provided."

34.    Notably, in their motion to dismiss the Securities Action, AAP and defendants Greco and Okray argued that this Court should disregard entirely or otherwise discount the allegations in the Securities Complaint based on the account of the confidential witness described as a former Senior Finance Executive of AAP and identified as "FE 8."  FE 8 is the same confidential witness whose account included the revelation of a Board meeting held in the Spring of 2017 due to the Company's disastrous internal forecasts, during which the topic of updating the Company's FY17 guidance was specifically raised by the Board and discussed with defendants Greco and Okray.  FE 8's account in the Securities Complaint also includes, among other things, allegations of a previous Board meeting held in late 2016 where it was decided that positive 3% across-the-board gross sales growth was needed to report to Wall Street.

35.    This Court, however, expressly declined the defendants' and the Company's demand to disregard or discount the allegations in the Securities Action based on the account of FE 8, and instead opined that FE 8's "position and responsibilities within the Company, and the time period during which he [or she] occupied that position, supports his or her credibility."

36.    Under these unique circumstances, where the only reasonable inference is that a majority of AAP's current Board members (defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee) either knew and approved of or consciously disregarded the

issuance of false and misleading statements on November 14, 2016, February 21, 2017, and May 24, 2017, eventually leading to the sustained Securities Action against AAP, pre-suit demand on the Board is excused and this derivative Action against the Individual Defendants should proceed for the benefit of the Company.

## II.   JURISDICTION AND VENUE

24.   This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").   This Court also has jurisdiction over all claims under 28 U.S.C. § 1332(a) because Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

25.   This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.   In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

27.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because nominal defendant AAP is incorporated in this District and conducts business in this District.

## III.   PARTIES

### Plaintiff

28.   Plaintiff is a current holder of AAP common stock and has continuously held AAP stock since at least 2013.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

29.     Nominal defendant AAP is a Delaware corporation with its corporate headquarters located in Raleigh, North Carolina.  According to its public filings, AAP is a leading automotive aftermarket parts provider in North America that serves DIY and Professional customers.  The Company's stores sell, among other things, original equipment manufacturer and private label automotive replacement parts, accessories, batteries, and maintenance items for domestic and imported cars, vans, sport utility vehicles, and light and heavy duty trucks.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AAP."

**The Individual Defendants**

30.     Defendant Greco has served as AAP's CEO and as a member of the Board since April 2016.  Defendant Greco has also served as President of the Company since August 2016.  According to the Company's own public filings with the SEC, including its most recent annual proxy statement, the Board has admitted that defendant Greco is a non-independent director of AAP because he is the President and CEO of the Company.  Upon information and belief, defendant Greco is a citizen of North Carolina.

31.     Defendant Okray previously served as the Company's EVP and CFO from October 31, 2016 until he suddenly announced his resignation on April 2, 2018 (effective April 15, 2018).  Upon information and belief, defendant Okray is a citizen of Illinois.

32.     Defendant Smith, who has been described by the financial media as the "most feared man in corporate America," joined the Board in November 2015 and has served as

Chairman of the Board since May 2016. Defendant Smith is the Managing Member, CEO, and Chief Investment Officer ("CIO") of Starboard, which defendant Smith co-founded in March 2011. Upon information and belief, defendant Smith is a citizen of New York.

33.     Defendant Bergstrom has served as a member of the Board since May 2008. In addition, over the last five years, defendant Bergstrom has served as Chairman and CEO of Bergstrom Corp., an automotive dealership group. According to AAP's public filings with the SEC, Bergstrom Corp. purchases hundreds of thousands of dollars' worth of automotive parts annually from the Company. Upon information and belief, defendant Bergstrom is a citizen of Wisconsin.

34.     Defendant Buss has served as a member of the Board since March 2016. Defendant Buss also has served as Chairman of the Board's Audit Committee (the "Audit Committee") since 2016. Upon information and belief, defendant Buss is a citizen of California.

35.     Defendant Ferraro has served as a member of the Board since February 2015, and previously served as the Company's Lead Independent Director from November 2015 through May 2016. Defendant Ferraro also previously served as a member of the Audit Committee, including in 2016 and 2017 when the events described and alleged herein transpired. Upon information and belief, defendant Ferraro is a citizen of Texas.

36.     Defendant Karaboutis has served as a member of the Board since February 2015. Defendant Karaboutis also has served as a member of the Audit Committee since at least 2016. Upon information and belief, defendant Karaboutis is a citizen of Massachusetts.

37.     Defendant Lee has served as a member of the Board since November 2015, when he was appointed to the Board by defendant Smith and by Starboard. Defendant Lee

has also served for approximately the last six years as President and CEO of Darden Restaurants, Inc. ("Darden").  Defendant Lee was installed as head of Darden during a proxy contest initiated (and won) by Smith and Starboard in 2014.   Upon information and belief, defendant Lee is a citizen of Florida.

38.     Defendants Greco, Okray, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee are referred to collectively herein as the "Individual Defendants."

## IV.     THE INDIVIDUAL DEFENDANTS' DUTIES

39.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

41.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

42.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a)  manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b)  neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c)  establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d)  neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business,

g)   to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

h)   ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

i)   remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

43.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants.

44.     The Company's Code of Ethics and Business Conduct (the "Ethics Code")
explicitly applies to all officers of the Company and to all Board members.  Among other
things, pursuant to the Ethics Code, the Individual Defendants were required at all times to:
(1) be "honest and truthful" in all dealings with stockholders; (2) comply with all federal, state
and local laws and regulations; and (3) ensure that all Company disclosures and public
communications accurately reflected transactions and events.

45.     Pursuant to the Company's Audit Committee Charter, the members of the
Audit Committee are required to assist the Board in monitoring, among other things, (1) the
integrity of the financial statements, reporting processes and internal controls of the Company
and its subsidiaries, (2) the performance of the Company's internal audit function and
independent auditors, (3) the qualifications and independence of the Company's independent
auditor and (4) the compliance by the Company and its subsidiaries with legal and regulatory
requirements.

46.     The Audit Committee Charter also specifically provides that the Audit
Committee members have the following duties, among others: (1) discussing earnings press
releases, as well as financial information and earnings guidance provided to analysts and rating
agencies; and (2) reviewing with management and the independent auditors the effectiveness
of the Company's disclosure controls and procedures and internal controls.

## V.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.     General Overview of the Company and the GPI Acquisition

47.     As of December 31, 2016, AAP operated more than 5,000 stores primarily under
the trade names "Advance Auto Parts," "Autopart International," "Carquest," and
"Worldpac." As of December 31, 2016, AAP's 4,881 Advance Auto and Carquest stores

accounted for more than 96% of the Company's total stores. For fiscal years 2016 and 2017, respectively, AAP reported total net sales of $9.57 billion and $9.37 billion.

48.     The Company is organized into three Divisions: North, South, and West (the "Divisions"). During the Class Period, one Division Senior Vice Presidents ("SVPs") supervised each Division: Mike Pack (West), Dave McCartney (South) and Jim Durkin (North). The SVPs in turn had oversight responsibility over 34 Regional Vice Presidents ("RVPs"). The 34 RVPs oversaw several hundred District Managers ("DMs") nationwide.

49.    On January 2, 2014, AAP announced that it had completed the acquisition of GPI. According to AAP's press release announcing the closing of the acquisition, GPI was "a leading privately held distributor and supplier of original equipment and aftermarket replacement products for commercial markets operating under the CARQUEST and WORLDPAC brands." Through the acquisition, AAP added to its operation "38 [GPI] distribution centers, 1,248 company operated CARQUEST locations across the US and Canada," and "approximately 1,400 independently owned CARQUEST locations primarily in the US and Canada." Additionally, AAP added WORLDPAC, "a leading importer and distributor of original equipment and quality aftermarket replacement automotive parts to import specialists in North America and Puerto Rico operating 105 facilities across the US and Canada," as part of the acquisition.

**B.     The Twenty-One Confidential Witnesses Whose Accounts Are Alleged in the Securities Action**

50.     According to the Securities Complaint, the confidential witness identified as "FE 1" was a Senior Financial Planning & Analysis ("FP&A") Analyst with AAP from June 2017 through the Class Period. FE 1 also had responsibility for the Company's forecasting. In those capacities, FE 1's responsibilities were to prepare the slide decks for weekly Monday

meetings, lasting from noon to approximately 3:00 or 4:00 p.m., in which the C-suite reviewed performance numbers ("Results Meetings"). Those slide decks contained daily and monthly sales numbers for stores, YOY variances, projections, and comparisons against the numbers of Advance Auto's competitors. FE 1 worked under FP&A Director Michael Keating, who, at defendant Okray's direction, led the Results Meetings, and reported directly to defendants Greco and Okray.

51.     According to the Securities Complaint, the confidential witness identified as "FE 2" was an FP&A Analyst with AAP from before the Class Period through 3Q17 at the Company's corporate offices in Raleigh, North Carolina. FE 2 was a member of the Finance Group. FE 2's team supported internal departments (such as supply chain and merchandizing) from a finance perspective. FE 2's subgroup also participated in developing Advance Auto's AOP. FE 2's team produced Quarterly Margin Forecasts in a report format which incorporated information obtained through the year and compared it to the AOP, which was established at the beginning of the year.

52.     FE 2's team reported information on the Company's missing of its margin plan to management, including Alan Lawson, a Director of Finance Support; the Vice President ("VP") of Pricing and Merchandising; and Charles Tyson, the EVP of Supply Chain Merchandising, who reported to Greco. In day-to-day conversations with the Director of Finance and other management personnel, FE 2 was involved in discussions regarding necessary internal restructuring as a result of the Company's poor performance, including anticipated layoffs. During the Class Period, FE 2 worked under Alan Lawson, a Director of Finance Support.

53.     According to the Securities Complaint, the confidential witness identified as "FE 3" was a Vice President of Sales & Operations at AAP prior to the Class Period and through Spring 2017 for stores located in both Eastern and Western areas of the United States. During that time, FE 3 also held a supervisory position in Store Operations at Advance Auto. FE 3 reported to Mike Pack, who reported directly to defendants Greco and Okray. FE 3 received FE 3's sales target numbers from Mike Pack, who received them directly from the C-suite. FE 3 and others argued with the C-suite over the unreasonable sales target numbers generated by the C- suite.

54.     According to the Securities Complaint, the confidential witness identified as "FE 4" was a Program Manager with Advance Auto from September 2010 through October 2017. In that capacity, FE 4 worked closely on the GPI integration, and presented at monthly meetings with SVPs to discuss risks, mitigation of those risks, and updates on different parts of the GPI integration project ("Integration Meetings"). C-suite executives attended those meetings. FE 4 reported to Allison Bubar, Director of Integration & Strategy, who reported to Bill Carter.

55.     According to the Securities Complaint, the confidential witness identified as "FE 5" was a Commercial Sales Manager with Advance Auto from mid-2016 through late 2017. In that capacity, after the integration began, FE 5 was responsible for parts of three states: Pennsylvania, Ohio, and New York. FE 5 managed approximately 11 Sales Representatives who reported directly to FE 5. In early 2017, FE 5 experienced, first hand, issues with the Company's deliveries. In or around February 2017, FE 5 attended meetings that included C- suite executives, such as defendants Greco and Smith, where FE 5 raised those same concerns again and was ignored. The meetings would instead be focused on the Company's stock price.

56.     Moreover, every three months, FE 5 received sales targets, which constantly increased, that were set by the C-suite. FE 5 felt sales targets were set so poorly, there was no way they could be overcome. FE 5 discussed those targets with FE 5's colleagues and counterparts in the Company's other regions, and found that their experiences matched FE 5's.

57.     According to the Securities Complaint, the confidential witness identified as "FE 6" was a Director of Supply Chain with Advance Auto from early 2015 through June 2017. FE 6 was a member of the Technology & Automation team. FE 6's team worked on elements of the integration including IT. In those capacities, FE 6 was responsible for all IT systems in warehouses including, but not limited to, hardware and software automation. FE 6 was directly involved in the integration efforts, including the Company's attempt to convert Carquest to Advance Auto's IT system and to convert both Carquest and Advance Auto to an entirely new system. FE 6 participated in monthly Integration Meetings with VPs and SVPs to discuss the status of the integration. The substance of these meetings was communicated by the SVPs to the C-suite. When FE 6 left, in June 2017, the integration was not targeted to be completed until January 2018. FE 6 reported to the SVP of Supply Chain, Todd Greene.

58.     According to the Securities Complaint, the confidential witness identified as "FE 7" was a Senior Business Analyst with Advance Auto from June 2016 through March 2017 in the Raleigh, North Carolina office. FE 7's team of analysts dealt with the integration issues that arose "all day, every day." FE 7's responsibilities included preparing forecasts by reviewing sales figures from both the AAP and Carquest systems, which were different. FE 7 focused on the Company's brakes and engine management segments. All analysts and finance teams had access to those systems. FE 7 met weekly with other team members and Kelly Dickens to review the Company's forecasts and sales numbers. FE 7 reported to Kelly

Dickens, Senior Manager of Merchandise Planning, who reported to Jaime Olson, Director of Merchandise Planning.

59.     According to the Securities Complaint, the confidential witness identified as "FE 8" was a Senior Finance Executive at Advance Auto's office in Raleigh, North Carolina from before the Class Period through mid-2017. FE 8 had a key role in sales forecasting and financial planning, and as such had visibility into the Company's Sales, Marketing, E-Commerce, and Supply Chain segments, among others. FE 8 was directly responsible for creating short- and long-term financial sales goals, as well as analyzing related sales metrics and other analytics. FE 8 personally prepared the sales forecasts, which were generated through a "bottoms up," algorithm-based approach, by which past sales trends and other data would be used to predict future sales ("Finance Forecasts"). FE 8 reported to Kevin Quinn, VP of Finance, who reported to defendant Okray.

60.     According to the Securities Complaint, the confidential witness identified as "FE 9" was an RVP in the South Division at Advance Auto from before the Class Period through mid-2017. In that capacity, FE 9 was one of 34 RVPs. According to FE 9, the chain of command at AAP was defendant Smith (Starboard), then defendant Greco, then Division SVPs, then RVPs, then DMs. Every Monday, the SVPs had a call with the CEO and his team to discuss Sales and targets ("SVP Call"). After that call, the SVPs prepared decks for calls with each SVP's respective RVPs at 10:00 am ("RVP Call"). Later in the day, the RVPs would have a call with the DMs. During the RVP Call, FE 9 and the other RVPs would be given a "Claw Back Spreadsheet," personally created by defendant Greco, which calculated how many additional sales were needed to get back to AOP. During 2016 and 2017, all RVPs at the Company were missing their targets. FE 9 also had access to and visibility into Advance

Auto's sales systems, called "Dashboard" and "Ignite," which confirmed this. FE 9 reported to SVP David McCartney, who reported to defendant Greco.

61.    According to the Securities Complaint, the confidential witness identified as "FE 10" was an RVP for the North Division at AAP from before the Class Period through Spring 2017. As an RVP, FE 10 was responsible for the sales and operations of over 100 stores in the North Division. Personally, FE 10 reviewed the performance of 15 Division Managers, each managing 15-20 stores. FE 10 participated in conference calls, attended by executive management, including defendant Greco, to discuss sales goals, and, specifically, why they had not been met. On those calls, defendant Greco spoke of his daily review of all 34 Regions' sales numbers. FE 10 reported to the President of the North Division, Jim Durkin, and later to his replacement, Mike Creedon, both of whom reported to defendant Greco.

62.    According to the Securities Complaint, the confidential witness identified as "FE 11" was a Director from before the Class Period through 1Q17 with responsibility for certain components of the GPI acquisition. Specifically, FE 11 was responsible for the commercial business integration and the integration of all Carquest stores. FE 11 reported to Vice President of Field Integration Mike Fogarty.

63.    According to the Securities Complaint, the confidential witness identified as "FE 12" was an RVP at Advance Auto from mid-2016 until mid-2017 with responsibility for hundreds of stores in the West Division. FE 12 reviewed the Company's daily sales reporting, which included metrics such as comp store sales increases, and the Company's current results compared to the corresponding period for the prior year. The CEO and CFO accessed that same information. FE 12 had insight into the integration's high costs and requirement of manual fixes. FE 12 reported to President Mike Pack, who reported to defendant Greco.

64. According to the Securities Complaint, the confidential witness identified as "FE 13" was a Field Process Manager at AAP from before 2010 until December 2017. FE 13 was directly involved in the acquisition of Carquest. In that capacity, FE 13 experienced severe issues with the integration and communicated them to superiors, including the C-suite. FE 13 reported to Mike Fogarty, VP of Field Operations.

65. According to the Securities Complaint, the confidential witness identified as "FE 14" was a Supply Inventory Planner at AAP from 2015 through the Class Period in Raleigh, North Carolina. In that capacity, FE 14 was responsible for, among other things, supply chain issues related to the integration. For example, on one occasion, FE 14 looked into a situation wherein an Advance Auto store in Bangor, Maine could not pull products from a Carquest DC that was 1.2 miles away. Instead, it had to pull from an Advance Auto DC that was 416 miles away.

66. According to the Securities Complaint, the confidential witness identified as "FE 15" was employed by AAP for more than 10 years, including as an Asset Protection Manager from the beginning of the Class Period through 2Q17. In that capacity, FE 15 was responsible for more than 200 stores, overseeing, among other things, issues of inventory and shrinkage related to the integration. FE 15 attended meetings, including one in March or April 2017 in Charlotte, North Carolina, which included all other Asset Protection Managers and Mike Cox, SVP of Asset Protection.

67. According to the Securities Complaint, the confidential witness identified as "FE 16" was a Planning Analyst at Advance Auto from 2015 to 2017. In that capacity, FE 16 worked to convert the Carquest stores to Advance Auto stores. FE 16's responsibility was to

ensure the Company's stores had adequate inventory. FE 16 did this by tracking the sales of parts. FE 16 attended town hall meetings led by defendant Greco.

68.     According to the Securities Complaint, the confidential witness identified as "FE 17" was a DM at Advance Auto from prior to the Class Period through 3Q17 in the Midwest Region of the United States. FE 17 had access to sales reporting for the Region. FE 17 discussed Company-wide sales declines with other DMs. In November or December 2016, FE 17 attended a meeting of all 12 Regional DMs and RVP Jason Hand to discuss 2017 sales targets. FE 17's region performed so poorly in 2016 that comp store sales targets were actually negative — something that, in Hand's experience, had never happened before. FE 17 also recalled discussions, which took place during January and February 2017, regarding cost-cutting measures such as cutting phones, cars, and personnel over a four to six month period. FE 17 reported to RVP Jason Hand, who reported to one of three or four Divisional SVPs, who reported to the CEO, CFO, and the Board.

69.     According to the Securities Complaint, the confidential witness identified as "FE 18" was a Store Manager at Advance Auto in Louisiana from mid-2016 to March 2017.

70.     According to the Securities Complaint, the confidential witness identified as "FE 19" served in Financial and Product Analyst roles, at Advance Auto from prior to the Class Period until 3Q17 in Raleigh, North Carolina. In that capacity, FE 19 was responsible for supporting Product Managers in their product acquisitions. FE 19 discussed the status of the Company's sales targets and performance with Category Managers.

71.     According to the Securities Complaint, the confidential witness identified as "FE 20" was a Manager with responsibilities which included pricing and other issues, who started at Carquest and joined Advance Auto as a result of the acquisition, from a period before

the start of the Class Period through the end of 2016. FE 20 was also a member of the General Product group. In those capacities, FE 20 led a team of 8-10 pricing analysts. FE 20's team worked with both corporate and field people to set prices. FE 20 reported to an SVP of Products in Raleigh.

72.     According to the Securities Complaint, the confidential witness identified as "FE 21" was a Sales Manager at Advance Auto from April 2016 to March 2017. In that capacity, FE 21 oversaw several stores in North Carolina. FE 21 reported to DM Chad Simpson.

###     C.     AAP's Core Business

73.     AAP sells to both DIY and "Professional" customers. The Company's DIY customers are primarily served through AAP's stores. The Company's Professional customers consist primarily of delivery customers for whom AAP uses a Professional delivery fleet to deliver product from a store or branch location to the professional customers' places of business, including garages and auto dealers.

74.     Since 2008, the Company has invested significantly in increasing Professional sales at a faster rate of growth. As explained in the Company's 2016 Annual Report on Form 10-K, AAP's Professional segment is its "growth engine," and "serving professional customers requires a high-quality product assortment, delivery service that is fast and consistent, technology to drive growth and the ease of doing business, a sales team dedicated to providing excellent customer service, and training to enable our customers to grow their business." As of December 31, 2016, the Company's sales were approximately 58% to Professional customers and 42% to DIY retail customers.

### D.      AAP Experiences Rapid Growth, Culminating in the GPI Acquisition

75.      Since the late 1990s, the Company has grown substantially, driven in large part by significant acquisitions, including its 1998 purchase of Western Auto Supply Co., 2001 purchase of Discount Auto Parts, Inc., and 2012 purchase of B.W.P. Distributors, Inc.

76.      On October 16, 2013, in its most recent and largest acquisition, AAP announced that it was acquiring GPI, a privately held company, for a purchase price of $2.04 billion. The acquisition closed on January 2, 2014.

77.      Prior to the acquisition, GPI was a distributor and supplier of original equipment and aftermarket automotive replacement products for Professional customers, and operated under the Carquest and Worldpac banners. At the time of the acquisition, GPI operated 1,233 flagship Carquest stores and 103 Worldpac branches located in 45 states and Canada. GPI also serviced approximately 1,400 independently-owned Carquest stores.

78.      By integrating Carquest's Professional-heavy sales into existing Advance Auto stores, the Company hoped to transform itself from a DIY-focused store into a dual-focused store (*i.e.*, DIY and Professional). Notably, this was a strategy that had been successfully employed by the Company's chief competitor, O'Reilly Automotive, eight years earlier in 2008 with its purchase of CSK Auto Inc. ("CSK").

79.      In a press release issued on October 16, 2013, the Company stated that its acquisition of GPI "creates the largest automotive aftermarket parts provider in North America, with annual sales of over $9.2 billion and more than 70,000 Team Members." The Company further heralded the acquisition of GPI for its ability to "Deliver[] Scale," i.e., provide "complete coast-to-coast coverage across North America, creating a company with scale, reach and expanded growth opportunities benefiting shareholders, customers and team members."

80.     The Company was quick to point out the synergies and cost savings it hoped to realize from the acquisition. The Company press release stated: "Advance anticipates that the transaction will result in approximately *$160 million* of annual run-rate synergies to be fully realized within three years after closing"—i.e., by January 2017. AAP's then-CEO, Darren R. Jackson ("Jackson"), was similarly quoted: "the combination of the two companies is a great fit and the synergy of GPI's assets with our capabilities will allow us to capitalize on market opportunities that will create value for our shareholders and provide even better service to our customers."

81.     The press release further announced that the critically important Carquest integration would be led by the Company's then-President, George Sherman ("Sherman"). At the time, Sherman was quoted as saying, "[w]e see commercial as an important part of our growth strategy."

82.     The deal was immediately heralded as a game changer—not just for AAP, but for the industry as well. For example, Deutsche Bank AG ("Deutsche Bank") wrote, "[w]e view this as a *game changing acquisition* which, by combining the #3 and #4 player in the industry by sales, *immediately creates the market leader*." In a report issued on October 16, 2013, Barclays called the deal "*highly transformative*." Credit Suisse Group AG ("Credit Suisse") echoed the sentiment: "[w]e view AAP's decision as a smart strategic acquisition that vaults the company into a *much stronger position in the faster growing and more attractive [do-it-for-me] segment* and gives them a crown jewel in Worldpac."

83.     Following the October 16, 2013 announcement, the Company's shares rose as much as 20%, reaching a then all-time high.

**E.     As AAP Stagnates, Starboard Takes Notice and Publicly Touts an Ambitious Plan to Accelerate the GPI Integration, Improve Margins by Up to 750 Basis Points, and Boost AAP's Stock Price**

84.     For a time, it appeared as if the Company was on track to deliver on its promise to realize $160 million in synergies by January 2017. The Company marched through 2014 and 2015 repeating and reaffirming its goal to achieve the long-promised synergies from the GPI acquisition.

85.     Still, despite the initial enthusiasm for the GPI acquisition, the synergies AAP hoped to realize did not immediately materialize. During 2015, comp store sales and operating margins stagnated and even declined. Investors were growing impatient with AAP's progress.



86.     Still, AAP's then-management team assured investors that all was "on track." During a conference call to discuss the Company's 2Q15 earnings on August 13, 2015, Sherman stated: "our core commercial business continues to face a larger proportion of integration related change, namely in people and products, *but showed steady improvement*."

With respect to the all-important integration of AAP's and GPI's IT systems, Sherman further stated:

> Our fifth key priority focuses on our systems and supply chain integration efforts. As mentioned previously we are focused on migrating to a common catalog, and we are on pace with our development efforts. ***We should be in pilot in Q1 of 2016 with a rollout to follow as we indicated last quarter***. This is also an enabler to aligning our supply chain systems, and ***we remain on track to begin the integration of the Carquest and Advance DC networks by the middle of next year***.

87.     Just a month and a half later, on September 29, 2015, with the Company all but treading water, the *Wall Street Journal* reported that the activist investor Starboard had acquired a 3.7% stake in Advance Auto.  At the time, AAP's stock was trading at roughly $170 per share. Starboard's investment, then worth more than $460 million, made Starboard one of the 10 largest shareholders of the Company.

88.     As is typical of Starboard's strategy when attempting to execute a corporate takeover, Starboard immediately convened a press conference, announcing its stake in AAP and laying out its business case for how it, through intervention in the Company, would improve AAP. At an investor conference in Toronto on September 30, 2015, Starboard laid out its case for how to accelerate the GPI acquisition and deliver significant value to shareholders.

89.     The presentation noted initially that AAP, while seemingly well positioned, had "***substantially underperformed peers on almost any measure***, including operating margins, revenue growth, and total shareholder return." What's more, it pointed the finger directly at AAP's current management, with a stinging slide showing the Company's margins had actually ***decreased*** following the GPI acquisition:



90.     Given AAP's "substantial[] underperformance," Starboard proposed a plan to turn the Company around.   Starboard's "Investment Thesis" was based on several "core pillars," including:

- Improve margins by **600 to 750 basis points**.
- Return significant capital to shareholders "through a **substantial dividend and/or buyback program**."
- "Pursu[e] **further industry consolidation**," particularly in the Professional segment, where "economies of scale and density of routes is critical, making further consolidation **highly strategic**."

91.     All told, Starboard estimated that its plan could be worth **in excess of $360 per share**, more than double AAP's then-current market price of $171.40 per share. If AAP was able to reach O'Reilly's level of profitability, the Company's implied stock price would be in excess of **$420 per share**:



92.     The market was impressed by Starboard's pitch. Shares of AAP soared nearly $20, or 11%, following the Toronto presentation, from $170.53 on September 29, 2015 to $192.04 on October 1, 2015.

93.     Analysts took notice as well, pointing both to Starboard's track record of turning distressed companies around and the speed with which it had done so. In a September 30, 2015 report, UBS Group AG ("UBS") wrote:

> For the longest time, the pitch on AAP was it could close the margin gap with its peers, creating significant value. ***Now, we think this investment case has much more credibility***. Starboard is a respected firm in the circles of investing in retail/consumer companies. ***It has a record of creating real change***. In our view, its preceding activist situations that closely parallel AAP lead us to believe ***there will be a greater level of accountability placed on AAP***.

94.     Similarly, in a September 29, 2015 report, J.P. Morgan Chase & Co. ("JPMorgan") wrote: "what we believe Starboard is focused on is the quality of execution and

*speed at which the targets are achieved* and ***thus their goal is to act as a credible threat to stir management change if these fall short***, in our view."

### F. Starboard Installs New Board Members, Ousts the Company's CEO, and Appoints Its Own Hand-Picked Management Team

95.     The market also understood that Starboard's investment signaled the beginning of the end for AAP's previous management regime. Indeed, Starboard wasted no time securing an agreement to install its handpicked team to lead AAP's purported turnaround.

96.     On November 12, 2015, barely a month after Starboard had disclosed its position in the Company, AAP announced an "agreement" with Starboard to implement a host of changes to meet the activist investor's demands (the "Starboard Agreement"):

- First, defendant Smith, Starboard's CEO and CIO, was appointed to the AAP Board.  Smith would serve as chair of the Nominating and Corporate Governance Committee (which was comprised of Smith and just one additional Board member) and as a member of the Compensation and Finance Committees. To accommodate Smith, the Company would expand the size of its Board from 12 to 13 members.

- Second, Starboard would designate two new directors to be added to AAP's Board at the Company's annual meeting in May 2016.

- Third, AAP agreed to replace two additional directors designated by Starboard at the annual meeting.

- Fourth, AAP's then-CEO, Jackson, agreed to step down, effective January 2, 2016.

- Fifth, the two-person Nominating and Corporate Governance Committee (chaired by defendant Smith), together with AAP's then-Executive Chairman, Jack Brouillard ("Brouillard"), would hire an executive search firm and initiate a process for selecting a new CEO for the Company.

- Finally, AAP's then-President, Sherman, would serve as AAP's interim CEO as part of a "leadership transition," while the Company searched for a permanent replacement as CEO.

97.     In a press release at the time, AAP's then-Executive Chairman, Brouillard, praised these decisions, and indicated the Board's willingness to work closely with Smith going forward: "Jeff is a respected leader, investor, and valued board member. *We welcome his insights*, and *the Board and I look forward to working closely* together as we successfully execute on our strategic objectives."

98.     While the announcement of the Starboard Agreement came on the heels of another disappointing quarter for AAP, investors and analysts seized on the management shift as a welcome development.  For instance, in a November 12, 2015 report, BB&T Corporation ("BBT") wrote: "[d]espite all the favorable underlying trends in the automotive aftermarket, Advance Auto posted a very poor Q3 EPS of $1.93. Missing consensus by $0.13 and our estimate by $0.18 was apparently all the board could take, *and it has now partnered with Starboard Value in an effort to turn things around*."

99.     Gordon Haskett Research Advisors ("Gordon Haskett Research"), in a report issued November 12, 2015, mused over Starboard's potential exit strategy:

> OK, so there is a new CEO coming and there is a pretty bad miss on the tape. That leads into the third piece of news which is the board is being overhauled. Coming in as one director will be Starboard's Jeffrey Smith and he will be bringing two designees with him. Beyond that, it looks like AAP will be naming two new directors ahead of the 2016 AGM. As you might have guessed, the "net net" in all this is a lower stock price. We'll see where it settles out but it looks like most of the Starboard pop will be coming out of the stock this morning. Looking forward, the big things to watch for are who will be named to run the company and whether AAP can meet and beat its margin goals. Also, *with so many new directors coming aboard, no CEO in place and knowing Starboard's affinity for putting hardline companies together, we certainly wouldn't rule out an attempt to merge the company*. Mind you, AAP couldn't find a PE buyer in 2012 and there very well could be some anti- trust problems with a AAP-ORLY deal, but given today's news and ORLY's experience pulling value out of an acquisition (CSK), we're keeping this idea on the menu.

100.     For its part, in the face of management upheaval and poor results, the Company continued to reaffirm its goal to achieve $160 million in synergies by January 2017, first articulated at the time of the GPI acquisition. UBS called the development "encouraging[]," but nonetheless cautioned that investors were growing wary of the Company's long term prospects: "[s]hould AAP miss this target, there is a risk for another round of downward revisions."

101.     Within days of the Starboard Agreement, the Company issued a press release announcing that defendant Lee, the President and CEO of Darden Restaurants, Inc. ("Darden"), had been appointed to the Company's Board by Smith and Starboard. Defendant Lee had previously been installed as head of Darden during a proxy contest initiated (and won) by Smith and Starboard in 2014.

102.     Then, on March 7, 2016, the Company announced that defendant Buss and another Starboard nominee, Reuben Slone ("Slone"), had been appointed to the Board. Much like defendant Lee, defendant Buss was already well-known to Starboard; less than three weeks later, he would be nominated by Smith and Starboard to the Board of Directors of Yahoo! Inc. ("Yahoo!") in connection with Starboard's efforts to replace Yahoo!'s entire Board.

103.     Less than a month later, on April 4, 2016, the Company announced it had hired defendant Greco to serve as its new CEO, and that Greco would also join the Board. Prior to joining AAP, defendant Greco had worked for 30 years as CEO of Frito-Lay's North America division.

104.     It was widely understood that defendant Greco had been hand-selected by Smith and Starboard. And while the hiring of defendant Greco was largely applauded, many

market watchers were quick to point out defendant Greco's inexperience in the automotive industry. Morgan Stanley, for example, wrote: "[w]e view AAP's appointment of Tom Greco as CEO a positive step in the company's turnaround," but the "market was hoping that AAP's next CEO would have auto parts experience," as the "industry is competitive, SKU/knowledge intense and run by management teams with significant tenure in the segment." Jefferies Group LLC ("Jefferies") similarly remarked, "we view Mr. Greco's limited turnaround experience and AAP's numerous 'moving parts' as his greatest challenge in the new role."

105.    Notably, despite defendant Greco's lack of experience in the automotive industry, analysts were reassured by the fact that AAP's interim CEO, Sherman—the architect of the Carquest integration—would stay on with the Company as President. JPMorgan, for example, wrote: "[w]e are also pleased to see the President George Sherman is staying on board given his hands-on knowledge of the turnaround and CARQUEST integration. Continuity, we think, is critical given the intense level of change occurring at AAP." Deutsche Bank similarly wrote, "Sherman staying gives us a bit more confidence that things are progressing in the right direction."

106.    Roughly one month later, on May 18, 2016, the Company announced that defendant Smith had been appointed Chairman of AAP's Board. In a news release, Smith touted the steps Starboard had taken since disclosing its investment the previous November: "[s]ince joining the Board in November, Advance has taken important steps to generate shareholder value, including implementing a more field-centric organization and appointing a new Chief Executive Officer."

107.    At the same time, AAP disclosed that its then-CFO, Mike Norona, would leave the Company after a successor was named.

108.    Any lingering doubts about who would be calling the shots at AAP going forward -- including on the Board -- had been erased.  As the *Triangle Business Journal* explained, "[*t*]*he board of directors at Advance Auto Parts is now firmly in the grips of activist hedge fund manager Jeffrey C. Smith*, CEO and managing member of Starboard Value."

109.    In the midst of its management overhaul, Starboard continued to increase its investment in the Company. During the week of May 30, 2016, while the Company's stock was trading at around $152 per share, Starboard purchased an additional 400,000 AAP shares, worth roughly $62 million. In a report issued on June 9, 2016, Wyatt Investment Research openly took aim at Starboard's purported turnaround, and questioned its subsequent investment:

> [T]he turnaround plan has not worked as anticipated. In the first quarter, it was more of the same: Advance Auto Parts' comparable store sales declined 1.9% year over year, and it reduced its store count by another 1.5%.
>
> With the company continuing to struggle, it is confusing to see Starboard double down on its investment in Advance Auto Parts shares.

110.    Starboard continued forward, undeterred. On July 29, 2016, in its most surprising move yet, the Company announced that Sherman would be stepping down, effective August 13, 2016. Following the move, analysts, such as BTIG LLC ("BTIG"), expressed skepticism at the rate with which Starboard had turned management over: "[i]n our opinion, the significant number of senior management changes at Advance Auto during a period of intensifying competition and during a critical juncture in the assimilation of ~2,500 Carquest stores (both company-owned and franchise) is *not ideal*."

111.    Then, on October 5, 2016, the Company named defendant Okray as its new EVP and CFO, completing AAP's near-total makeover. In a press release, the Company said Okray

is "very familiar with a supply chain that must respond rapidly to online demand," which would be "increasingly critical to accelerating our growth at Advance going forward." Echoing Starboard's Toronto presentation, defendant Okray was likewise quoted as saying: "Advance is a well-positioned industry leader with an extraordinary opportunity to deliver improved performance." At the same time, the Company announced that its Chief Accounting Officer ("CAO"), Jill Livesay, would resign. Starboard's transformation of the Company was complete.

### G. Following Starboard's Effective Takeover, the Individual Defendants Claim "Positive" Growth and Announce a Bold Five Year Plan to Maximize Margins and Grow Sales

112. With a new management team and Board in place, the Individual Defendants sought to reset investor expectations about AAP's growth and margin prospects. On November 14, 2016, the Individual Defendants caused AAP to release its third quarter 2016 results. They continued to be dismal, with comp store sales of negative 1% and operating income of just $217.6 million.

113. Yet, the Individual Defendants—deflecting from the lack of improvement that was delivered since Starboard had taken over, and facing the prospect of Starboard's massive investment losing much more value so close to year end—spun another story. They announced an ambitious five-year plan, which they intimated was already well under way.

114. Defendant Okray told analysts on the November 14, 2016 Earnings Call ("3Q16 Conference Call"), in no uncertain terms: "*[f]or 2017, we will deliver positive sales comp growth and a modest increase on operating margin.*" Greco later explained, "*we're excited about our comp prospects for the next year, very excited about it.*" The Individual

Defendants further promised 500 basis points of margin expansion—or $500 million in gross productivity—by 2021.

115.    Also on November 14, 2016, defendants Greco and Okray gave a presentation to investors in which they reaffirmed their commitment to "positive" comp store sales growth, this time providing additional detail and indicating that the Company expected "***[m]id-single digit comparable sales growth***." The presentation further repeated the Individual Defendants' guidance of "[a]t least 500 basis points of operating margin improvement."





116.    The Individual Defendants' presentation also touted the purported progress AAP had made in integrating AAP's and Carquest's respective IT systems:



117.    On the earnings conference call that day, defendant Greco touted these slides and concluded, "[t]he bottom line here is that our changes are leading to increased sales, lower costs, lower inventory levels, and higher customer satisfaction."

118.    The market reacted very favorably to these statements. Notwithstanding another quarter of lackluster performance AAP's stock shot up nearly 15% overnight.

119.    Analysts latched on to defendant Greco's promise of positive comps, improved margins, and 500 basis points of margin expansion. For example, in a report issued November 15, 2016, Credit Suisse, wrote:

> AAPs Q3 and strategic update was **one of the better scenarios** for this stock with better than expected comps, positive commentary on Q4, a roughly in line 2017 outlook, **and a new sense of direction on how this new management team will narrow the margin gap with peers** timed with Q3/4's improvement, this **should** help instill some early confidence in this team**."**

120.    RBC Capital Markets ("RBC") similarly noted: "[t]hese results reflect a **meaningful acceleration** on both a two-year (to -0.5% from -3.2%) and three-year basis (to

+1.0% from -0.6%) and ***should be viewed encouragingly*** given Advance's recent slew of top-line disappointments driven by company-specific issues."

121.    As alleged in the Securities Action based on the accounts of multiple confidential witnesses, however, the Individual Defendants' projections were wholly fabricated targets generated with little to no input from AAP's sales force and regional managers, and had no basis in the actual performance being modeled by AAP's experienced Finance Team.

122.    As the year closed, AAP's stock price was buoyed by the Individual Defendants' optimistic, headline-grabbing promises, and neared close to the $170 price at which Starboard had acquired AAP's shares.

123.    Unsurprisingly, given the unequivocal promise of increased comp store sales and operating margins from the Individual Defendants, market commentators were beguiled. On January 12, 2017, CNBC's Jim Cramer extolled that given how AAP's turnaround had "worked so well all sort of acquirers could be salivating over this company at these levels."

124.    On February 21, 2017, the Individual Defendants caused the Company to publish its 4Q16 results. The Company's comp store sales were seemingly positive (3.1%), but AAP posted subpar results in operating income ($106 million) and EPS ($0.84). In a report issued the next day, February 22, 2017, Barclays noted that "[m]argin and EPS was ***disappointing***," and Guggenheim Partners ("Guggenheim") said "we remain on the ***sideline***."

125.    In an effort to once again distract from the evidence that Starboard was continually failing to show any appreciable margin improvements or sales growth, the Individual Defendants once again offered a tantalizing, but untrue, projection for 2017 performance. Along with the Company's fourth quarter results, the Individual Defendants

offered further detail on their FY17 Guidance to investors, which included comp store sales growth of *0% to 2%*, and *15 to 35 basis points* in margin improvement.

126.     Once again, the market interpreted this guidance as proof that Starboard's strategic plan was working and viewed the FY17 Guidance as confirming the Individual Defendants' November 2016 promise of "positive" comp store sales and 500 basis points in margin expansion. For instance, on February 22, 2017, Guggenheim wrote that the FY17 Guidance's comp store sale growth and EBIT margin expansion "aren't meaningfully different than management's [November 14, 2016] initial" guidance. Jefferies similarly noted the FY17 Guidance was "consistent with AAP's previously stated strategic plan to regain share and drive sales growth as *management reiterated their target of 500 bps* of operating margin expansion over the next five years."

127.     However, as set forth below, there was no factual basis behind these projections, which were directly contradicted by internal Company data. As would later be confirmed, sales and margins had been declining steadily in late 2016, and the Company's own internal forecasts were showing gross sales growth of negative 2%-4% for 2017.

**H.     Behind the Scenes, the Company Struggles to Integrate Carquest and Forecasts Negative Sales Growth for 2017**

**i.     AAP Fails to Integrate the AAP and Carquest Legacy IT Systems**

128.     At the time Starboard purchased its $460 million stake in AAP, the Company was still in the process of integrating GPI and, in particular, its flagship Carquest stores. Despite the Company's outward projections of confidence, the integration had been marred by delays and setbacks, which had resulted in lost customers, supply chain disruptions, IT integration issues, and inventory build-ups.

129.    Most significantly, according to the accounts of confidential witnesses in the Securities Action, in 2016 and 2017 Advance Auto and Carquest stores and DCs operated on two distinct legacy IT systems, dubbed internally as "Red" (Advance Auto) and "Blue" (Carquest). Notably, however, the respective IT systems were not compatible with one another. According to the account in the Securities Action of FE 13, a Field Process Manager, the Red and Blue systems were like "oil and water." This lack of compatibility led to a host of problems which prevented AAP from realizing any real synergies from the GPI acquisition in 2016 and 2017.

130.    First, according to the account in the Securities Action of FE 10, an RVP, the Company lost sales it should have won because AAP stores were not able to access parts that were located in Carquest's inventory, and vice versa. This problem was particularly acute in the context of the highly lucrative "Professional" market-which AAP hoped to capture with the Carquest acquisition-whose main feature of differentiation was time to delivery. Unable to get parts to customers in time, the Company lost significant business.

131.    For example, according to the account in the Securities Action of FE 14, a Supply Inventory Planner, FE 14 recalled investigating an incident where an AAP store in Bangor, Maine could not pull products from a Carquest DC 1.2 miles away, but instead had to pull from an AAP DC 416 miles away. By the time the product arrived, the customer had already left.

132.    Such issues were, moreover, communicated directly to certain of the Individual Defendants. In December 2016, for example, according to the account in the Securities Action of FE 10, an RVP in the North Region, FE 10 attended a conference call with defendant Greco, EVP Charles Tyson, SVP Bill Carter, North President Durkin, RVP Morgan Schaefer, RVP Frank Miller, RVP Jason Hand and others to discuss why sales goals had not been met for

November 2016.  Each RVP told defendant Greco the problem was supply: store managers could not get their parts to customers in time, which in turn caused them to miss out on sales. During the call, defendant Greco specifically referenced a report that showed FE 10's DC had only a *70% probability* of getting parts to the stores on time—well short of the Company's goal of 98%, as told by FE 10.

133.  Second, and relatedly, the Company struggled to maintain appropriate levels of inventory because it lacked an effective means to track its sales across AAP and Carquest stores. According to the accounts of FEs 3 and 10 in the Securities Action, with inadequate inventory, customers were frequently told the Company did not have the products they needed.

134.  The Company's inventory woes also led it to lose significant amounts of product from shrinkage.  According to the account in the Securities Action of FE 15, an Asset Protection Manager, FE 15 attended a meeting in March or April 2017 in Charlotte, North Carolina, with all of the Company's other Asset Protection Managers and Mike Cox, SVP of Asset Protection. Cox said: "[w]e have $19 million in shrink and did not report it. Don't ever repeat this. It is our job to find it." FE 15 further recalled an Asset Protection Manager, Gloria, who had shrink issues in the Western territory she oversaw of $7 to $8 million.

135.  Such issues were also communicated directly to certain of the Individual Defendants. For instance, according to the account in the Securities Action of FE 3, an RVP, FE 3 attended quarterly operational meetings in Roanoke and Raleigh during the Class Period, which were attended by all executives at the RVP level and above, including defendants Greco and Okray.  According to the account of FE 3, inventory issues were repeatedly raised at these meetings as an impediment to sales, yet Greco would deflect to unrelated topics, refusing to address the inventory concerns. According to the account of FE 3, defendant Greco's priorities

"were not related to selling parts."  According to the account of FE 3, FE 3 realized the employees' complaint were futile. Eventually they stopped.

136.    According to the account in the Securities Action of FE 5, a Commercial Sales Manager, FE 5 similarly recalled attending a meeting at the corporate headquarters in Raleigh in or around February or April 2017, where FE 5 raised the IT integration and sales challenges facing the Company at that time with Greco and Smith directly. According to the account of FE 5, there was "no clear message" regarding FE 5's concerns. Instead, the response was: "we need to cut costs, so let's cut employees."

137.    Other high-level executives closely tracked the progress of the integration and reported back to certain of the Individual Defendants, as described in the accounts in the Securities Action of FEs 4 and 6.  In particular, according to the account of FE 6—a Program Manager who supported the Director of Integration & Strategy—SVPs, including SVP of Supply Chain, Todd Greener, attended monthly Integration Meetings to discuss its progress. The Integration Meetings were also attended, at times, by EVP Charles Tyson and the CEO. According to the account of FE 6, during the Class Period, the SVPs reported back to defendants Greco and Okray following the Integration Meetings.

138.    According to the account in the Securities Action of FE 4, a Program Manager, FE 4 stated that all of the executives and SVPs who attended the Integration Meetings were well aware of how poorly the integration was going during the Class Period. FE 4 recalled that the issue of inventory and supply chain was consistently discussed at the Integration Meetings, and senior executives knew of it during the Class Period. According to the account in the Securities Action of FE 7, a Senior Business Analyst, FE 7 agreed that the integration issues

were "all day, every day." And per the account in the Securities Action of FE 6, the progress of the integration was "never fast enough."

139.    In short, per the account in the Securities Action of FE 16, a Regional Pricing Analyst, the "polar opposite" IT systems created an infuriating and duplicative process for ordering customer parts and tracking inventory.  According to the account in the Securities Action of FE 8, a Senior Executive with forecasting responsibility, the declining comp store sales growth was due to "traffic and transactions." That is, unable to ensure they had the parts that were needed, customers stopped shopping at AAP. In fact, according to the account in the Securities Action of FE 8, the number of sales (i.e., "transactions") AAP had been generating was declining by 5% YOY from mid-2015 through June 2017, when FE 8 left AAP.

140.    By all accounts, the IT problems persisted throughout the Class Period, continuing to press down on AAP's sales. To be sure, these wounds were largely self- inflicted. According to the account in the Securities Action of AAP's Director of Supply Chain Integration, FE 6, the Company had decided by no later than Fall 2016 that the Red and Blue systems needed to be converted to a new, proprietary system. But rather than address the issue, defendant Greco punted. According to the account in the Securities Action of FE 3, a former Vice President of Sales and Operations, under the direction of Jackson and Sherman, "the number one concern was the integration of Carquest." But after defendant Greco took the helm, the Carquest issues were "not a priority," and "were not even in the top 5" issues defendant Greco wanted to focus on.

141.    Tellingly, per the account in the Securities Action of FE 6, as of June 2017, the Company was "*stillformulating plans*" for how to convert the systems. Remarkably, despite the known issues with the incompatible Red and Blue Systems, according to the account of

FE 6, the first conversions were not scheduled to begin until ***January 2018***. Multiple additional accounts of FEs in the Securities Action confirmed the Red and Blue IT systems had not been merged by the time of their departure:

- Per the account in the Securities Action of FE 9, the IT issues had not been fixed by July 2017.

- Per the account in the Securities Action of FE 14, a Supply Inventory Planner who worked extensively on the Company's supply chain, the IT issues had not been fixed by September 2018.

- Per the account in the Securities Action of FE 3, the IT issues had not been fixed by January 2018.

### ii.    As IT Issues Mount, the Individual Defendants Exacerbate AAP's Problems by Making Drastic Cuts

142.    AAP's problems in the second half 2016 and first half of 2017 were not limited to IT.  Indeed, per the account in the Securities Action of FE 9, an RVP, "integration of IT inventory was bad, ***but the loss of people was worse***."

143.    According to the account in the Securities Action of FE 18, AAP people and Carquest people could not agree on anything. Faced with sagging sales due to unaddressed integration problems, the Individual Defendants resorted to drastic labor cuts in an effort to deliver the margins they were promising investors.  According to the account in the Securities Action of FE 2, a Financial Analyst, bad conditions at AAP led to layoffs.  Per the account in the Securities Action of FE 13, AAP tried to become more "lean" by cutting the jobs of good, well-performing individuals.

144.    More specifically, beginning in January and February 2017, according to the account in the Securities Action provided by FE 17, a DM, there were discussions of cost cutting measures such as personnel cuts, and cuts to Company phones and cars.  According to the allegations in the Securities Action, FE 5 similarly recalled that the Company cut roughly half

of its Commercial Sales Managers in February or April 2017. The Securities Action alleges that numerous former RVPs, including FEs 9 and 12, explained how the Company laid off 22 of 34 RVPs and hundreds of DMs in or around June 2017—over a conference call. In fact, the Company's own annual public disclosures—which show a decrease of ***3,000 employees***, or more than 4% of its labor force, between February 23, 2017 and December 30, 2017—largely corroborate this information.

145.   The massive layoffs led to other less obvious—but equally detrimental—consequences. Most notably, a large-scale customer service crisis arose from the intermingling of AAP and Carquest employees, who were most used to dealing with DIY/retail and Professional customers, respectively. That is, as AAP consolidated Advance Auto and Carquest stores, bringing former Carquest employees to work at nearby Advance Auto stores, those employees lacked the customer service skills and experience to secure sales with DIY/retail customers. In that regard, the Individual Defendants ignored the differences in the DIY/retail and Professional industries, which, as described in the Securities Action by FE 11—who was responsible for the commercial business integration and the integration of all 1,200 Carquest stores—require two completely separate strategies.

146.   According to the Securities Action, FE 11 further stated that Carquest commercial customers were not moving over to AAP at the expected rates because AAP was perceived as a retailer with poor commercial parts. Furthermore, according to the account of FE 11, when AAP tried to impose its business will on the Carquest employees, many were put off and resigned, taking with them Carquest customers. FE 11 stated the poor rate of conversion became evident shortly after acquisition and never trended up. FE 11 added, "[t]hey purchased Carquest. There was a growth expectation, but not a lot of thought was put into the

disruption that the acquisition would cause." Customers would only come to AAP so long as they had confidence in the Company's employees, mentioned FE 18, and the decline in employee quality had eroded customer confidence.

147.    Further detracting from employees' performance, the integration problems created what FE 16 described in the Securities Action as an environment where morale was "not great" the entire time FE 16 worked there.   In the Securities Action, FE 20, a Pricing Manager who had come over from Carquest, said AAP saw great turnover in upper sales leadership during the Class Period. FE 9, an RVP who had an extended period of service with the Company, resigned over frustration with AAP's treatment and implementation of its layoff strategy. Management became increasingly toxic, according to FE 19, a Product Data Specialist, as executive management became estranged from the employees that remained.

148.    More fundamentally, departures and layoffs led to a strain on resources during the Class Period. According to the account provided in the Securities Action, FE 8 said the supply chain became undermanned, further exacerbating an already dire situation with the failing IT integration of the inventory management systems. FE 5 similarly explained in the Securities Action that fewer employees left the Company without staff to make deliveries, and the labor shortages were so bad at times that store managers were forced to make deliveries themselves.   FE 5 "definitely lost customers" because of the labor shortages.

149.    According to the account in the Securities Action of FE 21, a Sales Manager, DMs monitored AAP stores so closely that, if a store was behind its target "daily sales numbers," the DM would call and tell the employees to "clock out and go home for the day" without pay. DMs would also look at weekly store performance figures. If a store was falling short of its weekly figures, the DM would cut the hours of employees at the store for the

upcoming week. FE 21 said payroll was the "biggest issue." "Everything was about payroll." The Company made cuts to payroll to try to cut store expenses.

> ### iii.   In the Face of Persistent IT Issues and a Depleted Labor Force, the Individual Defendants Are Consistently Told of Poor Sales, Reduced Margins and Negative Forecasts

150.    The internal chaos and unaddressed integration issues made it impossible for the Company to meet, let alone exceed, the sales and margin targets set by management. Indeed, internally, it was widely acknowledged that sales teams were unable to meet their targets, quarter after quarter.

151.    For example, according to the Securities Action, during weekly RVP Sales Meetings throughout the Class Period— telephonic meetings which occurred at 10:00 am with SVP McCartney and all South Division RVPs—FE 9 was consistently told by McCartney that sales were missing targets.5 At these meetings, McCartney presented sales data using a so-called Claw Back Spreadsheet, personally created by Greco. The Claw Back Spreadsheet: (i) calculated the sales needed to get back to the Company's AOP (i.e., target or budget) for each RVP; (ii) ranked each RVP's monthly, weekly and annual sales growth; and (iii) showed the Company's total sales needed to get back to AOP. During late 2016 and early 2017, all RVPs were in "**Negative Comp"** Status. In other words, it was obvious to defendant Greco that the Company could not meet the targets he and defendant Okray had set.

152.    Similarly, according to the account in the Securities Action provided by FE 12, at the time an RVP, from mid-2016 through June 2017, the majority of AAP's stores nationwide were **trending down** in terms of sales. In fact, only two of the 15 RVPs in FE 12's

---

5      Defendant Greco would later confirm the existence of such meetings during a conference call on November 14, 2017: "[w]e have a call every week with the RVPs where we get feedback. We have ways of hearing from our districts and reporting back up."

Division were meeting their sales targets during this time. FE 12 based this information on FE 12's review of daily sales reporting which, like defendant Greco's Claw Back Spreadsheet, tracked total sales on a daily basis and ranked each RVP's comp store sales.

153.    According to the Securities Action, many additional FEs have corroborated FE 9's and FE 12's account that the Company was performing poorly and missing its targets leading up to and throughout the Class Period. For example:

- According to the account of FE 7—a Senior Business Analyst in charge of forecasting sales for car brakes (AAP's largest revenue producer)— sales during 2016 were on a *downward trend* and there were *declines across the board*.

- According to the account of FE 2, a Financial Analyst with AAP, the Company missed its operating margin AOP targets for 4Q16 by a *greater amount than any previous quarter in the year*, and missed its targets in 1Q17 and 2Q17 by *double digit basis points*.

- According to the account of FE 3, at the end of 2016 and in early 2017 "*nobody was 'winning'*" (i.e., hitting their sales targets).

- According to FE 5's account, FE 5 never hit sales targets during 2017, and sales misses were "*rampant*" among FE 5's Commercial Sales Manager counterparts during the same time period.

- According to FE 17's account, FE 17's District and Region were operating at approximately *negative* 8% or 9% year-to-date comp store sales growth when FE 17 left in June 2017.

154.    According to the Securities Action, numerous FEs confirmed that certain of the Individual Defendants were aware of and directly informed about the trajectory of sales within each of the sales regions. For example, according to the account of FE 17, defendant Greco sent out quarterly e-mails to demand the sales personnel raise their numbers. Defendant Greco continued this practice during 4Q16 and 1Q17.  FE 17 added that, not only did defendant Greco have access to programs that tracked the Company's sales numbers—daily and,

sometimes, even hourly—like Ignite, but defendant Greco was, in fact, tracking and scrutinizing those sales numbers.

155.    Likewise, during 4Q16, according to the account of FE 8 in the Securities Action, FE 8 personally participated in weekly Results Meetings with defendants Greco and Okray where attendees discussed sales performance and trends, and the reasons for the negative results. Results Meetings were held weekly at 4:00 pm in the Company's Raleigh, North Carolina office, to discuss results against AOP and forecasts. These meetings were led by FP&A Director Mike Keating, and attended by defendants Greco and Okray, as well as the Company's Executive Vice President of Pricing, Executive Vice President of Merchandise, Executive Vice President of Inventory, Vice President of Finance, Department Heads, and other executives.

156.    The "rampant" sales misses were also explained by the unattainable targets set by defendants Greco and Okray which formed the basis for their guidance to investors.  In fact, to deliver on their promise of up to 2% comp store sales growth, defendants Greco and Okray established an "across the board" directive to raise sales by 3%, which they knew to be unattainable. More precisely, in addition to rapidly declining results, defendants Greco and Okray were shown forecasts which showed *negative* trends for 2017 during Results Meetings. The Securities Action alleges that as a Senior Executive -- Finance, with forecasting responsibility, FE 8 personally prepared these sales forecasts, which were generated through a "bottoms up," algorithm-based approach, where past sales trends and data would be used to predict future sales ("Finance Forecasts"). In August 2016, FE 8's Finance Forecasts showed gross sales growth of *negative 3%* for 2017.

157.   Refusing to accept the Finance Forecasts, late in 3Q16, defendant Greco spearheaded a reorganization of the financial reporting within the Company. He created four "Divisional Presidents," each with their own financial analyst or "Operator" placed in the field. Greco then directed the Operators to generate a second, more aggressive set of forecasts ("Greco Forecasts"). According to the account in the Securities Action of FE 8, the Greco Forecasts were "*pie in the sky*." Notably, however, by Thanksgiving 2016, even the best Greco Forecasts for 2017 were just *negative 1.5%* gross sales growth.

158.   According to the account in the Securities Action of FE 8, after reviewing the "pie in the sky" Greco Forecasts in Fall 2016, defendant Greco personally set an across the board gross sales target of *positive 3%*. FE 8 added that this directive coincided with a Board meeting held in late 2016, where it was decided that positive 3% gross sales growth was needed to report to the Street.

159.   Notably, in late 2016, the following current directors of AAP were members of the Board: defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee.  These directors make up a majority of the current members of the Board.

160.   In December 2016, defendant Okray reaffirmed defendant Greco's target, vowing to hold the field accountable to the 3% directive.

161.   According to the Securities Action, FE 3 confirmed that defendants Greco and Okray then "pushed down" on the RVPs, demanding 3% sales growth "*across the board in all stores*." FE 3 added that such a "top down" directive had never happened before, as it made little sense to expect all stores, regardless of location, to hit the same target.

162.   According to the account in the Securities Action of FE 10, point blank sales targets for 2017 were not attainable: "*no, we knew they [targets] weren't*." FE 10 added that

to post a 0-2% comp store sales growth, as the Individual Defendants would later tell investors, would have been "*monumental*." According to the Securities Action, FE 5 agreed sales targets were set so poorly, there was no way they could be overcome, and FE 21, a store manager, likewise said sales targets were "impossible to hit."

163.   With no viable plan to meet the 3% target through organic sales alone, the Individual Defendants proposed a host of desperate initiatives to boost profitability. They suggested marketing promotions, price cuts, store closings and consolidations, and staff reductions. But the initiatives failed to take hold. By late December 2016, according to the Securities Action, FE 8's Finance Forecast for gross 2017 sales had dropped to *negative 4% to 5%*.

164.   By early 2017, the situation had become dire. According to the account in the Securities Action of FE 8, in January 2017, defendant Greco hired a team of approximately 30 consultants from McKinsey & Co. ("McKinsey") in a last ditch effort to drum up sales. Even McKinsey was of no help, however.

165.   No later than mid-March 2017, according to the Securities Action account of FE 8, the "shit hit the fan." The financial situation coming out of 1Q17 was a "disaster," prompting a Board meeting. At the time, according to FE 8, AAP had missed 1Q17's sales AOP by *$25-$30 million*, and was approximately *$20 million* behind plan for 2Q17. FE 5's territory alone—which included parts of Ohio, Pennsylvania and New York—was *$20 million below AOP* going into March 2017. During the Board meeting, according to FE 8, the Board specifically asked defendants Greco and Okray if they wished to update the Company's forecast. *They declined*, and no update was provided at that time or thereafter by the Individual Defendants to the public, either with the Board's approval or its conscious disregard.

166.     Notably, the timing of FE 8's allegation in the Securities Action with respect to this Board meeting is corroborated by the Company's own 2018 Schedule 14A Proxy Disclosures, which state that the Board "met seven times" during 2017, during which the Board "reviewed and discussed the quarterly and annual reports prior to filing with the SEC," and "reviewed and discussed the quarterly earnings press releases."

167.     In the Spring of 2017, the following current directors of AAP were members of the Board: defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee.  These seven defendants comprise a majority of the members of the current Board.

168.     Rather than come clean, the Individual Defendants continued to deflect. During the Company's 1Q17 results call on May 24, 2017, they blamed poor sales on the weather, promised sales in the second half of 2017 would accelerate and reaffirmed the guidance issued in February. Defendant Greco even went so far as to say the "soft patch" in 1Q17 was "***a blip, not a trend***."

169.     But, per the accounts provided in the Securities Action, numerous FEs have repudiated the Company's excuses as baseless. FE 3 stated that the Company "***was never on track***" to hit the target it provided to Wall Street, and FE 3 "would have been fired" if FE 3 had blamed poor sales on the weather. FE 16 had never heard that gas or weather was causing negative sales. FE 14 said gas and weather were no more of a factor for AAP than for any other retailer. In short, according to FE 9, "***[w]hatever they said to Wall Street was not real***."

170.     With none of the core problems impacting sales addressed, the Company's situation continued to deteriorate. Less than nine months after defendant Greco's initial promise of "***positive***" comp store sales growth, and just six months after issuing his baseless guidance of up to ***2%*** comp store sales growth, the Individual Defendants were forced to admit that the previously issued projections were false. On August 15, 2017, the Individual

Defendants slashed AAP's guidance. The Individual Defendants cut comp store sales growth projections from positive 2% to negative 1%-3%, which were the very numbers FE 8 had provided to defendant Greco eight months earlier. Similarly, the Individual Defendants slashed their projections for 2017 operating margins by ***200 to 300 basis points***, again consistent with the information defendant Greco had been provided by FE 2's team prior to issuing the made-up projections in November 2016 and February 2017.

171.    During a conference call with investors the same day, defendant Greco attempted to issue a *mea culpa*: "[w]e lacked the ***coherent strategy***. Our frontline ***turnover was unacceptable***. Our technology platforms were ***segregated and difficult to navigate***. And our supply chain infrastructure was ***duplicative and siloed***." Each of these concessions was of course true. But the Individual Defendants did not simply make an innocent mistake in issuing the FY17 Guidance. Instead, they deliberately ignored hard data and issued guidance (or approved the issuance of guidance) they knew to be unattainable, and thus false.

172.    Indeed, the market was quick to see through defendant Greco's half-hearted apology. Analyst RBC said "management has disappointed investors and ***hurt some of their initial credibility***," while Credit Suisse wrote "***it's difficult for investors to see that this is the bottom*** [u]ntil AAP can show that earnings can grow, it's likely ***stuck in the penalty box***."

173.    Following the announcement, the Company's stock price plummeted $22.24 per share, or over ***20%,*** to close on August 15, 2017 at $87.08 per share.

## VI.    INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    November 14, 2016 Statements

174.    On November 14, 2016, the Individual Defendants caused AAP to file a Current Report on SEC Form 8-K. In the press release attached to the Form 8-K, the Individual

Defendants caused the Company to announce its results for the third quarter of fiscal year 2016 (ended October 8, 2016) ("3Q16 Press Release"). In the 3Q16 Press Release, defendant Greco made the following statement touting the Company's quarterly results and its outlook:

> *Our third quarter results reflect progress in driving our top line as the initiatives and investments we are making to stabilize and improve our sales performance began to take hold*. While we delivered sequential improvement, our results are not where we want them to be and we remain relentlessly focused on taking the actions necessary to improve our execution and generate positive comparable sales performance.

175. Also on November 14, 2016, certain of the Individual Defendants participated in the 3Q16 Conference Call to discuss the Company's 3Q16 results and outlook. During the 3Q16 Conference Call, defendant Okray emphasized the Company's FY17 Guidance with analysts:

> The opportunities Tom [Greco] and Bob [Cushing] discussed to deliver improved results are familiar to me. I'm used to putting the customer first always. And I know we can drive accelerated sales growth and margin expansion included in our plan.
>
> Turning to the financial impact of our plan. *For 2017, we will deliver positive sales comp growth and a modest increase in operating margin*. By 2021 our plan delivers mid-single digit comp sales and at least 500 basis points of margin expansion. *As Tom previously discussed, we're building a platform to enable sustainable growth and operating leverage*. To achieve that goal, we've worked backwards from the customer and balanced our efforts to achieve growth, reduce costs and efficiencies throughout the organization.

176. Defendant Greco also had an exchange with an analyst from BTIG about the Company's FY17 Guidance on positive sales comp growth and operating margins:

> **[ANALYST]:** Okay. And just hypothetically, if, let's say there's an industry turn-down and sales don't meet your modest positive comps for next year. What point do you start to maybe take a more draconian view on perhaps closing a few distribution centers and/or closing some stores? Or is that not on the drawing board, even if you hypothetically don't meet your plan next year?
>
> **[GRECO]:** Well, first of all, *we're excited about our comp prospects for next year, very excited about it*.

**B.** **February 21, 2017 Statements**

177.    On February 21, 2017, the Individual Defendants caused AAP to file a Form 8-K, signed by defendant Okray, with the SEC. In the press release attached to the Form 8-K, AAP reported its fourth quarter fiscal 2016 (ended December 31, 2016) financial and operational results ("4Q16 Press Release") and included AAP's "2017 Full Year Assumptions," a continuation of its FY17 Guidance. This disclosure provided as follows:

| New Stores | 75 to 85 new stores including Worldpac branches |
|---|---|
| ***Comparable Store Sales*** | ***0% to 2%*** |
| ***Adjusted Operating Income Rate*** | ***15 to 35 basis points improvement*** |
| Income Tax Rate | 37.5% to 38.0% |
| Integration & Transformation Expenses | Approximately $30 million to $35 million |
| Capital Expenditures | Approximately $250 million |
| Free Cash Flow | Minimum $400 million |
| Diluted Share Count | Approximately 74 million shares |

178.    Also on February 21, 2017, certain of the Individual Defendants participated in a conference call to discuss the Company's 4Q16 results and outlook ("4Q16 Conference Call").

179.    During the 4Q16 Conference Call, Greco made the following remarks:

So going forward, our overarching focus is clear: we're going to put the customer first, we're always going to do that, and our goals remain clear. ***And we plan to accelerate sales growth to above the industry average, and we're going to close the margin gap versus our competition***. So to achieve it, we're evolving the culture of the company to one that's excessively focused on the customer and one with an exceedingly high level of accountability, ownership, and drive for results.

***So we're really excited about 2017***. We'll be working with a high level of urgency to deliver on our objectives, and we look forward to updating you again on our progress next quarter.

180.    Additionally, during the 4Q16 Conference Call, Defendant Okray stated:

Now, turning our attention to the full year outlook for 2017. ***We expect to deliver comparable store sales in the range of 0% to 2% and an adjusted operating margin increase between 15 basis points to 35 basis points for the year***. Notably, our full year adjusted operating margin expansion estimate also includes new inflationary pressures and expected cost increases in 2017 that either did not exist or were not material for us in 2016.

\*        \*        \*

In summary, we are very pleased with our meaningful top-line progress in Q4 and remain confident in our strategy that we shared with you in November.

181.    During the 4Q16 Conference Call, defendant Okray reaffirmed the Company's FY17 Guidance in the context of ongoing integration efforts and expenses in responding to a question from an analyst from Morgan Stanley:

[ANALYST]: So my follow-up, I'll just make it two parts. So following up to that answer, does that mean, does this capitalization expense now roll off? Are we through it, and therefore, we should see that improve, meaning the gross margin rate improve from that, the lack of that headwind? And then second part of the follow-up, if you take the 15 to 35 basis points of margin expansion in next year's guidance, is that purely a function of the leverage from the comp range 0% to 2%, or is there anything contemplated in the timing of as you get some of these SG&A savings, if that goes better, is that in that guidance range as well?

[OKRAY]: Yes, Simeon, let me take that one. With respect to the capitalization supply chain cost, that's going to continue as we right size and optimize our inventory. Quite frankly, it's the right thing to do for the shareholders, it's the right thing to do for the Company, and we're going to make that decision every day of the week. So it's going to be lumpy over time, but that's something that we need to do as we're building this transformation for the long haul. There's tremendous amount of cash flow opportunity by getting our AP ratio in line. Definitely underperforming our peers, not where we want to be. ***With respect to the guidance, I think that it's going to be both of the things that you said. One is, it's going to be the top-line growth of the 0% to 2%, and as we build this productivity muscle that Tom described, we expect to also see benefits from not only SG&A, but also the gross profit line***.

182.    Further, in response to a question from a UBS analyst about the Company's financial performance, defendant Greco emphasized that the Company was gaining

momentum in improving its comp store sales performance, something that was of particular importance to investors and analysts in reinforcing the FY17 Guidance on comp store sales and operating margin:

> **[ANALYST]:** What the market wants to see over the long run is that you can generate sales, gross margin expansion, SG&A leverage consistently on a quarter- to-quarter basis. Have you seen anything in the business that would prevent you from doing that over time, and how long do you think it's going to take for you to get to be able to sustainably producing that algorithm?

> **[GRECO]:** *Well, thanks, Michael. First of all, we really are excited about the performance in the fourth quarter on the comp sales.* That was the most difficult piece that we had to tackle was to improve our comp sales performance and start to regain share momentum with our customers.

183.    Earlier in the call, defendant Greco emphasized improving comp store sales as well, stating: "*[w]e're very pleased with our improving comp sales performance*."

184.    In the context of the ongoing difficulties being experienced with AAP's integration of Carquest, analysts at Jefferies took note of AAP's FY17 Guidance as part of "new" management touting its ability to execute on the integration and deliver 500 bps in synergies as part of its five-year strategic plan:

> We expect AAP's Q1 comp to slow sequentially to +0.7% from Q4's +3.1%, weighed by unfavorable weather and the calendar shift of a holiday into Q1'17. Management's FY'17 comp guide of 0-2% should be 2H weighted as customer service initiatives drive top line growth, while planned investments are expected to weigh on 1H margins with FY'17 EBIT expected to increase 15-35 bps. ***This is consistent with AAP's previously stated strategic plan to regain share and drive sales growth as management reiterated their target of 500 bps of operating margin expansion over the next five years.***

185.    On February 22, 2017, Guggenheim agreed that the FY17 Guidance's comp store sale growth and EBIT margin expansion "aren't meaningfully different than management's [November 14, 2016] initial" guidance.

C.       **May 24, 2017 Statements**

186.     On May 24, 2017, the Individual Defendants caused AAP to file a Form 8-K

with the SEC. In the press release attached to the Form 8-K, the Individual Defendants caused

AAP to report its first quarter fiscal year 2017 (ended April 22, 2017) financial and operational

results, which missed consensus estimates ("1Q17 Press Release"). The 1Q17 Press Release

contained the following statements from Defendant Greco:

> *Our first quarter comparable store sales declined 2.7%. As expected, comparable store sales were unfavorably impacted by the shift in New Year's Day to the first quarter of 2017 as well as the significant shift of winter related demand into December. These factors pulled sales forward into the fourth quarter of 2016 and reduced comparable store sales in the first quarter*. Taking into account these shifts and normalizing for their impact across the 28 week period including the fourth quarter of 2016 and first quarter of 2017, *we delivered positive sequential improvement in comparable store sales performance of approximately 70 basis points versus the third quarter of 2016*. This steady improvement demonstrates that we are making progress to improve our top line performance by taking decisive and consistent actions across the organization as we refocus the company on the customer.

187.     Also on May 24, 2017, certain of the Individual Defendants participated in a

conference call to discuss the Company's 1Q17 results and outlook ("1Q17 Conference Call").

During the 1Q17 Conference Call, defendant Greco stated:

> *In Q1, our comp store sales performance was down 2.7%. This result reflects the impact of a series of factors we anticipated in Q1, as well as short-term headwinds that were not planned*. These headwinds impacted the entire industry in Q1.

*       *       *

> *The sequential improvement we've delivered in recent quarters demonstrates we're making real progress*. At the same time, we were not immune to the macro headwinds within the industry, which resulted in unexpected substantially softer consumer demand in the middle of Q1, as reflected in the publicly available data. This timeframe was worse than expected and resulted in a slow start to the spring selling season.

*       *       *

[W]e delivered an adjusted operating margin rate of 7.1% and adjusted EPS of

$1.60. Taking all this into account, we remain confident with the progress we're

*making as we execute our plan and expect sales and customer momentum to continue with more operating leverage as we enter the back half of 2017*.

We're performing well relative to our primary input metrics as the beginning and end of the quarter was in line with expectations. *Unfortunately, the middle of the quarter was below plan, as was broadly experienced across the industry. We also believe the sales softness was short-term in nature given recent trends*.

\*       \*       \*

What we showed in November was our goal is to perform above the industry average in terms of sales growth and to expand margins significantly from where they are today. *That stands as we sit here today*.

188.    During the 1Q17 Conference Call, defendants Greco and Okray also had the following exchange with analysts from Credit Suisse, RBC, and Citigroup, Inc. ("Citi") regarding Advance Auto's FY17 Guidance:

**[ANALYST]:** I just wanted to clarify. On the guidance, did you guys actually update the comps or EBIT margin targets you laid out previously?

**[GRECO]:** So let me step back from this one, Seth, and provide some context. Our approach is to provide guidance once a year. And consistent with our focus on operating for the long term, we're not going to provide regular updates as a matter of course. The long-term outlook for the industry remains very, very compelling for us, and we remain focused on executing the key elements of our transformation plan. *With respect to 2017, well, Q1 had a weak patch in the middle of the quarter that impacted the entire industry. We've actually seen improved trends over the last several weeks, and based on this, we expect a more normalized environment for the rest of the year. And our investments in the customer are clearly having an impact, and with our productivity initiatives kicking in, in the back half of the year, we feel all of this will drive significantly improved results*.

**[ANALYST]:** That's helpful. And then as you think about those long-term productivity targets that you updated today, does the timing change at all? So you shortened the time frame. Does that impact 2017 or more of the incremental savings in '18 and beyond?

**[OKRAY]:** Yes. I'll take that one. Yes, the timing from -- for the additional $250 million is primarily going to be in '18 and beyond. *As Tom stated, we're not going to change guidance in fiscal year '17.  We're comfortable with the outlook for OI adjusted that we provided*.

\*       \*       \*

**[ANALYST]:** Just a quick clarification. Tom, did you just say you are comfortable with the OI guidance that you previously provided?

**[OKRAY]:** *Yes*. I mean, as a matter of course, we are going to update guidance -- we're going to give guidance once a year. We're going to give a fiscal year guidance. As Tom said, we're very comfortable with the industry dynamics. We're very comfortable with the strategic initiatives that we've got, availability, our digital online plans are accelerating, customer experience on the DIY side. *We expect to see these improvements in the second half of the year, and it gives us confidence in our ability to drive top and bottom line performance*.

> \*                          \*          \*

**[ANALYST]:** I was wondering, are you -- with the trends that you're seeing to date following the end of Q1, are you seeing comps running in line with your annual guidance for comp? And I guess also, what's the comps lift benefit that you're getting from some of those, the availability test initiatives that you're rolling out? And how big is that right now as a percent of your store base?

**[GRECO]:** We're not going to comment specifically, Chris, on the quarter, I mean. *But we've seen a dramatic improvement in our comps, obviously, coming off a difficult Q1*. The -- your second question was on the -- repeat your second question?

189.    Also during the 1Q17 Conference Call, defendant Greco had the following exchange with an analyst:

**[ANALYST]:** Maybe to shift gears just a bit. You talked a lot about the soft patch in sales here in Q1, and by no means are you the only company, you had a competitor yesterday talking about it too. Just to maybe get your perspectives on what caused that, what was different this time around? As the business ticked up, was that a rebound, or is that more of a normalization?

**[GRECO]:** Yes, Brian. Again, I'll reiterate, we've looked at every number. The long-term variables are very positive. They point to the 3% to 4% we referenced earlier. *The short-term impact of what happened in February and March, we looked at all the factors you'd expect. We've looked at products, geographies, channels, customers, weather, tax. Everything we look at says that this was a blip, not a trend*.

190.    Despite missing their FY17 Guidance for the first quarter, which, as set forth below in Section VI, partially revealed the falsity of their previous misstatements, the Individual Defendants continued to mislead the market regarding the Company's ability to meet its comp store sales and operating margin targets for 2017. Indeed, while investors were

disappointed in the comp store sales miss, the takeaway for analysts participating in the 1Q17 Conference Call was that the Company was standing by its FY17 Guidance.

191.    BTIG told investors in a report issued that same day that "[management] reiterated 2017 guidance for 15-35 bp of EBIT margin expansion" and made clear that Defendants' full year 2017 guidance remained at 0% to 2% for comp store sales. Likewise, JPMorgan reported that "the company reiterated it (sic) FY17 guidance of 0-2% comp. and 15-35 bps of operating margin expansion." And Jefferies noted:

> AAP reported below-expectation comps & adj. EPS of -2.7% & $1.60. Despite the miss, management noted 'dramatically improved' comps in early Q2, consistent with peer feedback. Encouragingly, AAP raised the company's gross cost-savings target to $750M and accelerated the timeline to four years from five.

### D.    THE TRUTH EMERGES

192.    On August 15, 2017, the Individual Defendants caused AAP to file a Form 8-K with the SEC.  In the press release attached to the Form 8-K, the Individual Defendants caused AAP to report its second quarter fiscal 2017 (ended July 15, 2017) financial and operational results ("2Q17 Press Release").  With respect to the Company's quarterly results, as well as outlook, the 2Q17 Press Release contained the following statements from defendant Greco revising the Company's guidance for 2017:

> We delivered sales growth and continued to close the comp sales performance gap versus the industry in Q2 while more than doubling year to date Free Cash Flow. Our revised guidance for the year incorporates the impact of industry headwinds in the first half, which we expect to continue in the second half of the year and we are taking the appropriate actions to adapt to this environment. We've now assembled a world class leadership team that is executing our transformation plan to significantly drive growth and long term shareholder value.

193.    Additionally, the 2Q17 Press Release disclosed the details of the Company's updated "2017 Full Year Assumptions" as follows:

| New Stores | 60-65 new stores |
|---|---|
| Comparable Store Sales | -3% to -1% |
| Adjusted Operating Income Rate | 200 to 300 basis points year over year reduction |
| Income Tax Rate | 37.5% to 38.0% |
| Integration & Transformation Expenses | Approximately $100 to $150 million |
| Capital Expenditures | Approximately $250 million |
| Free Cash Flow | Minimum $300 million |
| Diluted Share Count | Approximately 74 million shares |

194.    Also on August 15, 2017, certain of the Individual Defendants participated in a conference call to discuss the Company's 2Q17 results and outlook ("2Q17 Conference Call"). During that conference call, defendant Greco stated:

We're still in the early phases of our turnaround and, as noted before, the historic lack of investment in the customer needed to be rectified. ***We lacked the coherent strategy. Our frontline turnover was unacceptable. Our technology platforms were segregated and difficult to navigate. And our supply chain infrastructure was duplicative and siloed***.

***All of this created a suboptimal experience for both customers and team members and was the primary reason our top line underperformed versus our competitive set by a wide margin for years***. Simply put, we were an easy share donor for our competitors. Our new team has been acutely focused on changing this. Our focused investments have consistently enabled us to narrow the gap over the past 52 weeks, demonstrating that our elevated focus on the customer is driving desired outcomes.

While we're narrowing the competitive gap versus peers, which gives us tremendous confidence in our investment, we also recognize the short-term headwind the industry is facing and have factored this into our full year guidance. ***You saw our fiscal 2017 guidance revision in our press release today. Our revised full year guidance ranges from down 3% sales comp on the low end to down 1% comp on the high end***. With regard to sales, there is little doubt the industry experienced a short-term drag on sales in the first half of 2017. This has been widely reported in both public company releases and syndicated data. While we don't think the softness is indicative of a longer-term trend, we do believe it's now prudent for us to plan for this softer industry backdrop to persist into the second half of 2017. As a result, we're moderating our growth expectations for 2017, as we do not

believe we'll offset the first half sales softness in the back half nor do we believe industry growth rates will snap back to historical levels in half 2.

195.    Similarly, during the 2Q17 Conference Call, defendant Okray stated:

Given that half of the year is behind us and considering both current industry sales environment as well as the ramp time of actions we are taking to flow through to the P&L, we believe it is now prudent to revise our 2017 guidance. Considering our first half comp performance, as well as the outlook we have for overall industry growth in the back half, we have revised our full year comp expectations to now be between down 3% and down 1%.

Turning to operating profit. We have revised our adjusted OI margin expectations to be between 200 and 300 bps decrease versus prior year. The primary driver of the change is the leverage of fixed cost associated with the lower comp expectations. Also, contributing to the change is a 75 bps headwind related to noncash expenses from reducing our inventory significantly more than we planned at the beginning of the year. Excluding the impact of the noncash expenses from inventory reduction, the adjusted operating income margin expectation . . . would be a 125 to 225 bps decrease versus prior year.

196.    On these disclosures, shares of the Company's stock fell by ***over 20%***, to close on August 15, 2017 at $87.08 per share, on heavy trading volume.

197.    Analysts attributed the drop to the Company's abrupt and dramatic change in 2017 guidance at such a late date. Credit Suisse's commentary after the 2Q17 Conference Call was to the point:

Still, there are questions; While AAP's Q2 was in line with market expectations, and ours, ***it was the guidance that was more problematic, as the sales outlook was lowered and earnings improvement weighted to Q4, which wasn't fully appreciated previously***. Margin guidance was cut to -200-300 vs +15-35 bps. Most of the questions yesterday centered on why such a significant revision, and if it reflects higher costs, delayed productivity gains, or just a kitchen sink guide. ***We believe that its primarily weaker sales as noted above***, along with the impact from inventory reduction efforts (75 bps now). ***Either way, it's easy to question whether this turnaround is progressing, and difficult for investors to see that this is the bottom, pending margin stabilization in Q4. Until AAP can show that earnings can grow, it's likely stuck in the penalty box***.

198.    The analyst at RBC was no less critical of the Individual Defendants' drastic shift on 2017 guidance and how it reflected on the Company:

Guidance may clear the deck, but ***credibility damaged*** – Advance lowered 2017 expectations to comps of (3%)-(1%) and an EBIT margin decline of 200-300 bps (or -125-225 bps excluding non-cash inventory reductions) from flat to +2% and EBIT expansion of +15-35 bps. The decline will primarily come from higher sales de-leverage, accelerated inventory reductions, and customer-facing investments. This outlook is fairly onerous and taken at face value, suggests significant margin deterioration in 2H17 despite $100mm of productivity gains. Our new estimates reflect these expectations. However, while ***management has disappointed investors and hurt some of their initial credibility***, we would also note that when the CEO first took the helm, he effectively guided to negative comps of ~(5%) for the balance of 2016 and the company ended up with a (1%) in 3Q and +3% in 4Q. So, we think Advance may have used this release to "clear the deck" and, potentially, put in a bottom to earnings expectations.

199. Gordon Haskett Research said that the Company got "smoked like a Virginia ham," and questioned whether defendant Greco's and Starboard's promised turnaround was still viable:

Justice was swift and heavy- handed at Roanoke-based Advance Auto Parts (AAP) yesterday which got ***smoked like a Virginia ham after the company outlined what now looks like a bleak 2017***. All this comes after AAP's new CEO – Tom Greco – laid out a five year plan last November that envisioned mid-single digit comps and at least 500 basis of margin expansion by 2021. ***To say that the trip to 2021 got off on the wrong foot would be an understatement as both comps and margins will be down this year***. Mind you, margins weren't particularly strong in 2016 so this is a case of "bad" being lapped by "worse." ***All this points to a turnaround story that is actually turning uglier and 2017 earnings of around $5***. This is less than half the amount that analysts were expecting two years ago.

## VII.   THE SECURITIES ACTION

200. Based on these events, in 2018 the Securities Action was filed in this Court on behalf of investors who purchased AAP stock during the Class Period.  The Securities Complaint, which set forth the allegations described herein based on the accounts of twenty-one confidential witnesses, was filed by the Lead Plaintiff to the Securities Action on January 25, 2019.

201. On February 7, 2020, the motion to dismiss the Securities Action filed by AAP, Greco, and Okray was denied in substantial part.  In other words, this Court concluded based

on the allegations set forth in the Securities Complaint that there was *indicia* that defendants Greco and Okray participated in a scheme to defraud AAP investors during the Class Period.

202.   In sustaining the Securities Action (in substantial part), this Court noted that "[c]ourts regularly draw an inference of scienter where 'Defendants had access to internal forecasts and the company's financial data' indicating that the company 'could not meet the projected revenues,'" and concluded that the allegations in the Securities Complaint were sufficient "to support an inference of scienter" as to certain public statements issued on November 14, 2016, February 21, 2017, and May 24, 2017.  Those public statements included:

- Okray's statement in the November 14, 2016 conference call with investors and analysts that "For 2017, we will deliver positive sales comp growth and a modest increase in operating margin."

- The Company's February 21, 2017 press release stating that for 2017, AAP's comparable store sales will grow between "0% to 2%" and adjusted operating income will "improve[]" by "15 to 35 basis points."

- Okray's statement in the February 21, 2017 conference call with investors and analysts that the Company "expect[s] to deliver comparable store sales in the range of 0% to 2% and store sales in the range of 0% to 2% and an adjusted operating margin increase between 15 points to 35 basis points for the year."

- Greco's statement during that same February 21, 2017 conference call that "we plan to accelerate sales growth to above the industry average, and we're going to close the margin gap versus our competition."

- Greco's statement during the May 24, 2017 conference call with investors and analysts "[t]hat [FY17 projections] stands as we sit here today."

- Greco's statement during that same May 24, 2017 conference call that "we remain confident with the progress we're making as we execute our plan and expect sales and customer momentum to continue with more operating leverage as we enter the back half of 2017."

- Greco's comment on the "soft patch" in sales compared to prior quarters during that same May 24, 2017 conference call, and statement that "[e]verything we look at says this was a blip, not a trend."

- Okray's statement during that same May 24, 2017 conference call that "we're not going to change guidance [i.e., projections] in fiscal year '17. We're comfortable with the outlook for [adjusted operating income] that we provided."

203. Notably, in their motion to dismiss the Securities Action, the Company and defendants Greco and Okray argued that this Court should disregard entirely or otherwise discount the allegations in the Securities Complaint based on the account of the confidential witness described therein as a former Senior Finance Executive of AAP and identified as FE 8. FE 8 is the same confidential witness whose account in the Securities Complaint included the revelation of a Board meeting held in the Spring of 2017, prompted by disastrous internal forecasts, during which the topic of updating the Company's FY17 guidance was specifically raised and discussed by the Board with defendants Greco and Okray. FE 8's account in the Securities Action also includes, among other things, allegations of a prior Board meeting held in late 2016 where it was decided that positive 3% across-the-board gross sales growth was needed to report to Wall Street.

204. This Court, however, in sustaining the Securities Action on February 7, 2020, expressly declined the defendants' invitation to disregard or discount the allegations in the Securities Action based on the account of FE 8, and instead opined that FE 8's "position and responsibilities within the Company, and the time period during which he [or she] occupied that position, supports his or her credibility."

## VIII.   DAMAGES TO AAP

205. AAP has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct alleged herein. As a direct and proximate result of the Individual Defendants' misconduct, AAP has expended and will continue to expend significant sums of money. Indeed, the Securities Action was sustained (in substantial part)

in February 2020, and the Court's February 7, 2020 denial of the Company's motion to dismiss presages great damages to AAP.

206.    Such expenditures include, but are not limited to: (a) legal fees associated with litigation against AAP and its officers and directors for violations of the federal securities laws, including the sustained Securities Action; (b) loss of reputation and goodwill, and a "liar's discount"[6] that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace; (c) amounts paid to outside lawyers, accountants, and investigators in connection with any investigation; and (d) loss of revenues and profits.

## IX.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

207.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

208.    Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Individual Defendants' wrongdoing alleged herein and has been a shareholder of the Company continuously since at least 2013.

209.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

210.    As a result of the factual allegations set forth herein, Plaintiff has not made any pre-suit demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because there is reason to doubt that a majority of

---

[6]    "Liar's discount" is a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that AAP's ability to raise equity capital or debt on favorable terms in the future is now impaired.

the members of the Board are capable of making an independent and/or disinterested decision to institute and vigorously pursue this action.

211.    The Board currently consists of eleven (11) directors: defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee (each of whom has served on the Board since at least April 2016), and non-parties Jeffrey J. Jones II, Sharon L. McCollam, Douglas A. Pertz, and Nigel Travis (each of whom joined the Board subsequent to the allegations of the Individual Defendants' misconduct alleged herein).

212.    Under Delaware law, a derivative plaintiff need only demonstrate reason to doubt that a majority of the directors are disinterested or objective in order to establish pre-suit demand excusal. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that at least six (6) current directors of AAP are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

213.    First, demand is excused because a majority (7 out of 11) of the Company's current directors -- defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee – are interested directors based on a substantial likelihood of liability in light of the allegations herein regarding a Board meeting held in or around March 2017, prompted by disastrous internal forecasts, during which the Board specifically discussed whether to issue corrected guidance to the public, and then failed to do so. As alleged in the Securities Action based on the account of FE 8, it was well-known at AAP that the financial situation coming out of 1Q17 was a "disaster," specifically prompting this Board meeting. Per the account of FE 8 in the Securities Action, despite the Board's specific discussion as to whether updated guidance should be issued to the public, no updated guidance was issued at that time or thereafter.

214.   Accordingly, the only reasonable inference to be drawn from the allegations set forth herein is that defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee either knew of and approved the issuance of public statements of false, unattainable guidance, and/or chose not to correct such false statements in a timely fashion, and/or consciously disregarded others' failure to correct such false statements in a timely fashion.

215.   Not only was this a textbook violation of non-exculpable fiduciary duties of loyalty and good faith to the Company and its shareholders under Delaware law by defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee; it was also a violation of the Company's Ethics Code, which explicitly applies to all Board members.  Among other things, pursuant to the Ethics Code, defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee were duty-bound as directors of the Company at all times to: (1) be "honest and truthful" in all dealings with stockholders; (2) comply with all federal, state and local laws and regulations; and (3) ensure that all Company disclosures and public communications accurately reflected transactions and events.  Clearly, Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee violated their fiduciary duties under Delaware law and the duties imposed on them by the Ethics Code.

216.   Notably, this Court has already concluded in the Securities Action (explicitly rejecting arguments advanced by defendant Greco) that FE 8's "position and responsibilities within the Company, and the time period during which he [or she] occupied that position, supports his or her credibility."

217.   Moreover, the timing of FE 8's allegation in the Securities Action with respect to the Board meeting described therein is corroborated by the Company's own 2018 Schedule 14A Proxy Disclosures, which state that the Board "met seven times" during 2017, during

which the Board "reviewed and discussed the quarterly and annual reports prior to filing with the SEC," and "reviewed and discussed the quarterly earnings press releases."

218.    Defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee each served on the Board in 2016 and 2017, and therefore they each face a substantial likelihood of liability.  Because defendants Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis, and Lee comprise a majority (7 out of 11) of the current members of the Board, pre-suit demand is excused and the demand futility inquiry in this Action need go no further.

219.    Pre-suit demand is nonetheless excused for other reasons.  Defendant Greco is one of the individual defendants to the Securities Action, and this Court has sustained securities fraud claims against him in that case, notwithstanding the materially heightened pleading standards imposed by the PSLRA.  Thus, defendant Greco also is interested based on a substantial likelihood of liability for this separate and distinct reason.  It would be impossible under such circumstances for defendant Greco to exercise disinterested and independent business judgment on the issue of whether AAP should prosecute this action.  Moreover, the Board has already admitted in the Company's public filings that defendant Greco lacks independence based on his principal professional occupation as the Company's President and CEO.  Accordingly, there is also reason to doubt defendant Greco's independence.

220.    Defendants Buss, Ferraro, and Karaboutis also are interested directors based on a substantial likelihood of liability in light of their conduct as members of the Audit Committee in 2016 and 2017.  Even putting aside that this Court can reasonably infer that each of these directors specifically discussed with their other colleagues on the Board whether to issue revised guidance in early 2017 based on the account of FE 8 in the Securities Action (and then failed to do so), defendants Buss, Ferraro, and Karaboutis, as members of the Audit

Committee, were specifically duty-bound to assist the Board in monitoring, among other things, the integrity of the financial statements, reporting processes and internal controls of the Company.  Defendants Buss, Ferraro, and Karaboutis were additionally obligated to discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; and to review the effectiveness of the Company's disclosure controls and procedures and internal controls.   In sustaining the Securities Action, this Court has concluded that certain public statements issued by the Company on November 14, 2016, February 21, 2017, and May 24, 2017, as set forth above, were materially false and misleading. Thus, defendants Buss, Ferraro, and Karaboutis and the Audit Committee, among other things, caused and/or permitted the Company to adopt ineffective internal controls over disclosure and financial reporting, which have rendered certain of the Company's previously disseminated statements false and misleading.  These actions caused defendants Buss, Ferraro, and Karaboutis to breach their non-exculpable fiduciary duties and now subject each of them to a substantial likelihood of liability.

221.    There is also reason to doubt the independence of defendant Bergstrom, because for approximately the last five years, defendant Bergstrom has served as the Chairman and CEO of Bergstrom Corp., an automobile dealership group. Per the Company's annual proxy statements for each of the last several years, car dealerships owned by Bergstrom Corp. regularly purchase automotive parts from the Company.  For example, per the Company's most recent proxy statement issued in April 2020, since the outset of 2019, Bergstrom Corp. has paid the Company approximately $400,000, and per AAP's previous proxy statement issued in April 2019, Bergstrom Corp. had paid the Company approximately $309,000 since the outset of 2018.  Thus, there is reason to doubt defendant Bergstrom's independence with

respect to evaluating a pre-suit demand in light of the beneficial, longstanding business relationship Bergstrom Corp. has maintained and continues to maintain with the Company.

## X.      CLAIMS FOR RELIEF

### COUNT I
### For Breach of Fiduciary Duties
### Against All Individual Defendants

222.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

223.    As AAP's directors and top officers, the Individual Defendants owed AAP and its shareholders fiduciary duties of loyalty, candor and good faith – the highest duties known to the law.  Rather than speak the entire truth when they said, or caused anything to be said, about the Company, the Individual Defendants breached their fiduciary duties by disseminating false and misleading statements.

224.    As a result of the Individual Defendants' fiduciary failures, AAP has been damaged.

225.    Plaintiff, on behalf of AAP, has no adequate remedy at law.

### COUNT II
### For Unjust Enrichment
### Against All Individual Defendants

226.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

227.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AAP.

228.    All the payments and benefits provided to the Individual Defendants were at the expense of AAP.  The Company received no benefit from these payments.

229.    Plaintiff, on behalf of AAP, seeks restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

230.    Plaintiff, on behalf of AAP, has no adequate remedy at law.

**COUNT III**
**Against Defendants Greco and Okray For Contribution Under §§10(b) and 21D of The Exchange Act**

231.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

232.    This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants Greco and Okray, each of whom is a named individual defendant in the Securities Action.

233.    AAP is named as a defendant in the Securities Action, which asserts claims under the federal securities laws for, among other things, violation of §10(b) of the Exchange Act.  If AAP is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of defendants Greco and/or Okray, as alleged herein.  The Company is entitled to receive contribution from those Defendants in connection with the Securities Action against the Company.

234.    As directors and/or officers of AAP, defendants Greco and Okray had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about AAP, and had the power and/or ability directly or indirectly to control or influence the specific

corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

235.    Defendants Greco and Okray are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

236.    Accordingly, AAP is entitled to all appropriate contribution or indemnification from defendants Greco and Okray, who are responsible for exposing AAP to liability under the federal securities laws.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duty, corporate waste and unjust enrichment;

B.    Directing AAP to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AAP and its shareholders from a repetition of the damaging events described herein;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and the state statutory provisions sued hereunder, including attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of from the Individual Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of AAP has an effective remedy;

D.     Awarding to AAP restitution from the Individual Defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.     Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 29, 2020

O'KELLY & ERNST, LLC

/s/  Ryan M. Ernst
Ryan M. Ernst (Bar No. 4788)
824 N. Market Street, Ste. 1001A
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

OF COUNSEL:

SHUMAN, GLENN & STECKER
Kip B. Shuman
Post-Montgomery Ctr.
One Montgomery Street, Ste. 1800
San Francisco, CA 94104
(303) 861-3003

SHUMAN, GLENN & STECKER
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003

SHUMAN, GLENN & STECKER
Brett D. Stecker

326 W. Lancaster Ave.
Ardmore, PA 19003
(303) 861-3003

**KASKELA LAW LLC**
Seamus Kaskela
18 Campus Blvd. Ste. 100
Newtown Square, PA 19073
(888) 715-1740