**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MARIO DIBATTISTA, derivatively on behalf of ADVANCE AUTO PARTS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 20-590-RGA |
| THOMAS R. GRECO, THOMAS OKRAY, JEFFREY C. SMITH, JOHN F. BERGSTROM, BRAD W. BUSS, JOHN F. FERRARO, ADRIANA KARABOUTIS and EUGENE I. LEE, JR., | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ADVANCE AUTO PARTS, INC., | ) ) | |
| Nominal Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court in this shareholder derivative action is the motion ("Motion") of Defendants Thomas R. Greco ("Greco"), Thomas Okray ("Okray"), Jeffrey C. Smith ("Smith"), John F. Bergstrom ("Bergstrom"), Brad W. Buss ("Buss"), John F. Ferraro ("Ferraro"), Adriana Karaboutis ("Karaboutis"), Eugene I. Lee, Jr. ("Lee") and Nominal Defendant Advance Auto Parts, Inc. ("AAP" or the "Company") seeking to dismiss, pursuant to Federal Rules of Civil procedure 12(b)(1), 12(b)(6) and 23.1, the operative Verified Shareholder Derivative Complaint ("Complaint") filed by Plaintiff Mario DiBattista derivatively on behalf of AAP. (D.I. 9)  For the reasons that follow, the Court recommends that the Motion be GRANTED-IN-PART and DENIED-IN-PART.

## I.     BACKGROUND

1

### A.      The Parties

Plaintiff is a citizen of Pennsylvania who has held AAP common stock since at least 2013.  (D.I. 1 at ¶¶ 28, 208)[1]  Plaintiff filed this suit derivatively on behalf of AAP.  (*Id.* at ¶ 1)

Nominal Defendant AAP is a public Delaware corporation headquartered in Raleigh, North Carolina.  (*Id.* at ¶ 29)  It sells parts and equipment for domestic and imported automobiles to both professional and "do-it-yourself" retail customers.  (*Id.* at ¶ 11)

All of the remaining named Defendants (the "Individual Defendants") except for Okray are currently involved with the management of AAP, in that they serve as members of AAP's Board of Directors (the "Board") and, in the case of Greco, as a high-level officer at the Company.  (*Id.* at ¶ 39)  Greco, a citizen of North Carolina, is a director of AAP and serves as President and Chief Executive Officer ("CEO") of the Company; he has been a member of AAP's Board since April 2016.  (*Id.* at ¶¶ 7, 30, 103)  Smith, a citizen of New York, joined the Board in November 2015 and has served as Chairman of the Board since May 2016.  (*Id.* at ¶¶ 32, 106)  Smith is also the Managing Member, CEO, and Chief Investment Officer of Starboard Value LP ("Starboard"), a company that Smith co-founded in March 2011 and that is an investor in AAP.  (*Id.* at ¶¶ 7, 32)  Bergstrom, a citizen of Wisconsin, has served as a Board member since May 2008.  (*Id.* at ¶ 33)  Buss is a citizen of California, has served as a Board member since March 2016 and has also been Chairman of the Board's Audit Committee (the "Audit Committee") since 2016.  (*Id.* at ¶¶ 34, 102)  Ferraro, a Texas citizen, has served as a Board member since February 2015; he previously served as AAP's Lead Independent Director from November 2015 through May 2016 and as a member of the Audit Committee in 2016 and 2017.

---

[1]      In the Complaint, certain paragraph numbers are used more than once (i.e., paragraph numbers 24 to 36).  (D.I. 1)

(*Id.* at ¶ 35)  Karaboutis is a citizen of Massachusetts; she has been a member of the Board since February 2015 and a member of the Audit Committee since at least 2016.  (*Id.* at ¶ 36)  Lee, a citizen of Florida, has been a member of the Board since November 2015.  (*Id.* at ¶ 37)  As for Okray, he is a citizen of Illinois and he previously served as AAP's Executive Vice President and Chief Financial Officer from October 2016 through April 2018.  (*Id.* at ¶ 31; *see also id.* at ¶ 111)

At the time Plaintiff filed his Complaint, AAP's Board consisted of 11 directors.  (*Id.* at ¶ 29; D.I. 10 at 3)  This group included seven of the eight Individual Defendants (Greco, Smith, Bergstrom, Buss, Ferraro, Karaboutis and Lee, or the "seven Individual Defendants"), as well as four others not named in the Complaint (Jeffrey Jones II, Sharon L. McCollam, Douglas A. Pertz and Nigel Travis) (collectively the "Demand Board").  (D.I. 1 at ¶ 29; D.I. 10 at 3)  As is noted above, the seven Individual Defendants were all members of the Board as of Fall 2016 and thereafter (i.e., at the time of certain relevant events, which are further discussed below).

### B.     Procedural History

Plaintiff's allegations in this case rely in part on allegations in a related securities case: *In re Advance Auto Parts, Inc. Sec. Litig.*, Civil Action No. 18-212-RGA (the "Securities Action").  The Securities Action is a class action lawsuit, which was initiated in this Court on February 6, 2018 against Greco, Okray and AAP.  (Civil Action No. 18-212-RGA, D.I. 1)  On January 25, 2019, the plaintiff in that case filed an amended class action complaint against the original defendants and two other defendants (Starboard and Smith), which alleged two Counts: Count I for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, and Count II for violations of Section 20(a) of the Exchange Act.  (Civil Action No. 18-212-RGA, D.I. 46 at ¶¶ 263-75)  After the defendants in the Securities Action

filed motions to dismiss the complaint against them, (Civil Action No. 18-212-RGA, D.I. 56, D.I. 57), on February 7, 2020, the District Court resolved those motions in a Memorandum Opinion, (Civil Action No. 18-212-RGA, D.I. 73).  In doing so, it granted-in-part and denied-in-part Greco, Okray and AAP's motion to dismiss, denying the motion as to portions of Count I and Count II.  (Civil Action No. 18-212-RGA, D.I. 73 at 18-19)  The District Court granted Starboard Value LP and Smith's motion to dismiss in its entirety.  (Civil Action No. 18-212-RGA, D.I. 73 at 19)  The Securities Action remains pending.

Plaintiff filed the instant Complaint in this case on April 29, 2020.  (D.I. 1)  Prior to doing so, Plaintiff did not make a demand on the Board to institute this action.  Plaintiff asserts it did not attempt demand because the effort would have been futile.  (*Id*. at ¶ 210)  The Complaint alleges three counts against Defendants:  Count I for breach of fiduciary duties (the duties of loyalty, candor and good faith) against all Individual Defendants; Count II for unjust enrichment against all Individual Defendants; and Count III against Defendants Greco and Okray for contribution under both Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 (the "contribution claim").  (*Id*. at ¶¶ 222-36)

On July 24, 2020, Defendants filed the instant Motion.  (D.I. 9)  On August 17, 2020, the Motion was referred to the Court for resolution by United States District Judge Richard G. Andrews.  (D.I 12)  Briefing on the Motion was completed on October 21, 2020, (D.I. 17), and the Court heard oral argument on the Motion via videoconference on January 13, 2021, (D.I. 30 (hereinafter "Tr.")).

## C.    Factual Background

Since 2008, AAP has invested heavily in sales efforts targeting professional installers, motivated by "a series of major acquisitions."  (D.I. 1 at ¶ 11)  One such investment involved AAP's October 2013 acquisition of General Parts International, Inc. ("GPI"), which was AAP's "highest profile addition to date[.]"  (*Id.* at ¶¶ 12, 76-77)  Following the acquisition of GPI, AAP's share prices rose "as much as 20%, reaching a then all time high."  (*Id.* at ¶ 83)  However, during 2014 and through most of 2015, AAP's growth stalled, due largely to difficulties with integrating GPI's computer infrastructures with those of AAP.  (*Id*. at ¶¶ 13-14)  The Company's comparable store sales ("comp store sales") and operating margins—its two most closely watched metrics—stagnated and declined during this time.  (*Id*. at ¶¶ 13, 85, 89)

In line with a new plan to boost AAP's earnings, in September 2015, Starboard acquired a 3.7% stake in AAP; thereafter, Starboard:  (1) installed Smith (its CEO) as Chairman of AAP's Board; (2) installed four additional new AAP Board members (including Lee, Buss and Greco); and (3) arranged for Greco and Okay to become AAP executives.  (*Id.* at ¶¶ 15-17, 96, 101-11)  After the new management team and new Board were in place at AAP, the Company released its third quarter 2016 results; these results were "dismal" with "comp store sales of negative 1% and operating income of just $217.6 million."  (*Id.* at ¶ 112)  By November 2016, AAP's stock had "declined over 20%" from its price a year earlier when Starboard acquired a stake in the Company.  (*Id.* at ¶ 18)

In that same month—November 2016—Defendants released a projection for 2017 performance to investors (the "FY17 Guidance").  (*Id.* at ¶ 125)  This FY17 Guidance included a projection of "comp store sale growth of 0% to 2%, and 15 to 35 basis points in margin improvement" for the 2017 year.  (*Id.* (emphasis omitted))

The Complaint also includes allegations about a confidential witness referred to as "FE 8" that are relevant to what happened next.   FE 8 is a former Senior Finance Executive at AAP, who worked in the Company's Raleigh office until mid-2017; in the Securities Action, FE 8 interviewed with the plaintiff's counsel, and content from those interviews was included in the operative complaint in that case (the "Securities Action Complaint").   (Civil Action No. 18-212-RGA, D.I. 46 at ¶ 48)[2]   The instant Complaint in this case, in turn, makes reference to certain of these FE 8-related allegations that are found in the Securities Action Complaint.

For example, the instant Complaint alleges that, according to FE 8, in early 2017 "it was being acknowledged internally at the Company that earnings were a 'disaster[.]'"  (D.I. 1 at ¶ 28; *see also id.* at ¶ 165)  The Complaint alleges that "[a]t the time, according to FE 8, AAP had missed [first quarter 2017's] sales AOP [which stands for "Annual Operating Plan"] by *$25-30 million*, and was approximately *$20 million* behind plan for [second quarter 2017]."  (*Id.* at ¶ 165 (certain emphasis in original, certain emphasis omitted))  "[A]ccording to th[e] . . . account provided by FE 8," the instant Complaint alleges, these "disaster[ous]" earnings "prompted a Board meeting" held in or around March 2017 (the "Spring 2017 Board Meeting").  (*Id.* at ¶ 28; *see also id.* at ¶¶ 165, 213)  During that meeting, the Complaint alleges that "the Board specifically asked defendants Greco and Okray if they wished to update the Company's forecast" and that "[Greco and Okray] declined, and no update was provided at that time or thereafter by the Individual Defendants to the public, either with the Board's approval or its conscious disregard."  (*Id.* at ¶ 165 (emphasis omitted); *see also id.* at ¶ 28 ("[T]he Board specifically

---

[2]       The instant Complaint also alleges that FE 8 "personally prepared [Company] sales forecasts[,]" as FE 8 was "a Senior Executive with forecasting responsibility" who was "directly responsible for creating short- and long-term financial sales goals[.]"  (D.I. 1 at ¶¶ 59, 139)  The Complaint also asserts that FE 8 "personally participated in weekly [r]esults [m]eetings with [D]efendants Greco and Okray[.]"  (*Id.* at ¶ 155)

discussed with defendants Greco and Okray whether the company should issue revised, corrected guidance, given [] disastrous internal projections [about 2017 revenue].  The Individual Defendants however, ultimately did not issue revised guidance."); *id.* at ¶¶ 34, 203, 213; Securities Action, D.I. 46 at ¶ 152)

The Complaint also alleges that from late 2016 up through mid-2017, AAP and/or its employees made eight knowingly false or misleading statements about the Company and its then-current and future financial picture.  Plaintiff refers to these as the "Potentially Actionable Statements."  (D.I. 10 at 4-6)  These eight statements are:

- Okray's statement in a November 14, 2016 conference call with investors and analysts that "[f]or 2017, we will deliver positive sales comp growth and a modest increase in operating margin."

- The Company's February 21, 2017 press release stating that for 2017, AAP's comparable store sales will grow between "0% to 2%" and adjusted operating income will "improve[]" by "15 to 35 basis points."

- Okray's statement in a February 21, 2017 conference call with investors and analysts that the Company "expect[s] to deliver comparable store sales in the range of 0% to 2% and store sales in the range of 0% to 2% and an adjusted operating margin increase between 15 points to 35 basis points for the year."

- Greco's statement during that same February 21, 2017 conference call that "we plan to accelerate sales growth to above the industry average, and we're going to close the margin gap versus our competition."

- Greco's statement during a May 24, 2017 conference call with investors and analysts "[t]hat [FY17 projection] stands as we sit here today."

- Greco's statement during that same May 24, 2017 conference call that "we remain confident with the progress we're making as we execute our plan and expect sales and customer momentum to continue with more operating leverage as we enter the back half of 2017."

- Greco's comment on the "soft patch" in sales compared to prior quarters during that same May 24, 2017 conference call, and [his] statement that "[e]verything we look at says this was a blip, not a trend."

- Okray's statement during that same May 24, 2017 conference call that "we're not going to change guidance [i.e., projections] in fiscal year '17. We're comfortable with the outlook for [adjusted operating income] that we provided."

(D.I. 1 at ¶¶ 33, 202 (certain alterations in original); *see also id.* at ¶ 190 ("[d]espite missing their FY17 Guidance for the first quarter [of 2017], . . . the Individual Defendants continued to mislead the market regarding the Company's ability to meet its comp store sales and operating margin targets for 2017"))

During the second half of 2017, after experiencing disappointing second quarter results, AAP made several public disclosures detailing various reasons for AAP's lower-than-anticipated performance for the first half of the year. (*Id.* at ¶¶ 30, 192-95) AAP also lowered its projections for its FY17 Guidance, now projecting that comparable store sales for the year would be "-3% to -1%[.]" (*Id.*) After making these disclosures, the Company saw its stock fall by "over 20%, to close on August 15, 2017 at $87.08 per share[.]" (*Id.* at ¶¶ 31, 196 (emphasis omitted))

Additional relevant facts will be provided below in Section III.

## II.    STANDARD OF REVIEW

### A.    Rule 23.1

Generally, a corporation's board of directors is tasked with the decision of whether to initiate or pursue a lawsuit on behalf of the corporation. Del. Code tit. 8, § 141; *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009). This responsibility flows from the "'cardinal precept'" of Delaware corporate law that "'directors, rather than

shareholders, manage the business and affairs of the corporation.'"  *Citigroup*, 964 A.2d at 120

(quoting *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).

Pursuant to Federal Rule of Civil Procedure 23.1, in order for one or more shareholders

to maintain a derivative action on behalf of a corporation in federal court, a shareholder

plaintiff's complaint must, *inter alia*, "state with particularity":  "(A) any effort by the plaintiff to

obtain the desired action from the directors or comparable authority and, if necessary, from the

shareholders or members; and (B) the reasons for not obtaining the action or not making the

effort."  Fed. R. Civ. P. 23.1(b)(3); *see also Raul v. Rynd*, 929 F. Supp. 2d 333, 340 (D. Del.

2013).  In this way, Rule 23.1 imposes a requirement that "a shareholder plaintiff make a pre-suit

demand on the board of directors prior to filing a derivative suit on behalf of the company, or

provide a satisfactory explanation for why the plaintiff has not done so."  *Raul*, 929 F. Supp. 2d

at 340.  The "demand requirement allows the corporate machinery to self-correct problems and

to safeguard against frivolous lawsuits."  *Id.*; *see also Ryan v. Gifford*, 918 A.2d 341, 352 (Del.

Ch. 2007).

In assessing a motion to dismiss filed pursuant to Rule 23.1, a court considers the well-

pleaded allegations of the complaint, authentic exhibits attached thereto, documents incorporated

into the complaint by reference and judicially noticed facts; in doing so, it draws all reasonable

inferences in favor of the plaintiff.  *Raul*, 929 F. Supp. 2d at 337 n.1; *Resnik v. Woertz*, 774 F.

Supp. 2d 614, 635 (D. Del. 2011).  However, the court is not obligated to accept as true bald

assertions, unsupported conclusions and unwarranted inferences, or allegations that are self-

evidently false.  *In re Caterpillar Inc. Derivative Litig.*, Civil Action No. 12-1076-LPS-CJB,

2014 WL 2587479, at *7 (D. Del. June 10, 2014) (citing *Raul*, 929 F. Supp. 2d at 341).

While Rule 23.1 sets out the pleading standard for derivative actions in federal court (including the specificity of pleading required as to pre-suit demand), the substantive requirements of demand are ultimately a matter of state law. *King ex rel. Cephalon Inc. v. Baldino*, 409 F. App'x 535, 537 (3d Cir. 2010). In that regard, Delaware state law, which is applicable here, instructs that when making a demand on the board of directors would clearly be futile, the demand requirement may be excused. *See Aronson*, 473 A.2d at 814-15, *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Successfully alleging that demand is excused, however, is a "difficult feat under Delaware law." *Ryan*, 918 A.2d at 352 n.23; *see also Richelson v. Yost*, 738 F. Supp. 2d 589, 597 (E.D. Pa. 2010) (citing *Ryan* and explaining that demand futility "is a very onerous standard for a plaintiff to meet").

As to allegations of demand futility, if what is at issue in the lawsuit is an actual decision made by the board of directors of a company, then a court must determine whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested or independent; or (2) the challenged decision or transaction was otherwise the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814; *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 820 (Del. Ch. 2005) (explaining that demand is excused if either prong of the *Aronson* test is satisfied). If, however, a plaintiff does not challenge a decision or transaction made by the board of directors, and instead challenges the directors' failure to do something, then the test articulated in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993) applies instead.[1] 634 A.2d at 934 & n.9; *see also In re China Auto. Sys. Inc. Derivative Litig.*,

---

[1] The *Rales* Court explained that requiring demand even when a board has not acted, such as in a circumstance where the board has "fail[ed] to oversee subordinates[,]" is "consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so." *Rales*, 634 A.2d at 934 n.9.

CONSOLIDATED C.A. No. 7145-VCN, 2013 WL 4672059, at *5 (Del. Ch. Aug. 30, 2013). Pursuant to the *Rales* test, a court must determine "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934; *see also In re China Auto. Sys.*, 2013 WL 4672059, at *5. One way that a plaintiff can make a showing of demand futility, sufficient to satisfy *Rales*, is by pleading facts sufficient to demonstrate that at least half of the Board would face a "substantial likelihood of personal liability" were they to comply with a shareholder's demand to pursue litigation. *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 170-71 (D. Del. 2009) (internal quotation marks and citation omitted).

### B.      Rule 12(b)(1)

Pursuant to Rule 12(b)(1), the Court may dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Motions brought under Rule 12(b)(1) may present either a facial or a factual challenge to the Court's subject matter jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *Enhanced Sec. Research, LLC v. Juniper Networks, Inc.*, C.A. No. 09-871-JJF, 2010 WL 2898298, at *2 (D. Del. July 20, 2010). With respect to a factual challenge, the Court may consider evidence outside the pleadings, including affidavits, depositions, and testimony, in order to resolve factual issues bearing on jurisdiction. *Enhanced Sec. Research*, 2010 WL 2898298, at *2 (citing *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997)). Moreover, in reviewing such a challenge, the presumption of truthfulness does not attach to the allegations of the complaint. *Id*. (citing *Mortensen*, 549 F.2d at 891). If the motion presents a facial attack, the Court may only consider the allegations of the complaint, and documents referenced therein, in the light most favorable to the plaintiff. *Id*. (citing *Gould*

11

*Elecs., Inc. v. United States,* 220 F.3d 169, 176 (3d Cir. 2000)).  Once the Court's subject matter

jurisdiction is challenged, the plaintiff must bear the burden of persuasion and establish that

subject matter jurisdiction exists.  *St. Clair Intell. Prop. Consultants, Inc. v. Palm, Inc.*, Civil

Action No. 06-404-JJF-LPS, 2009 WL 1220546, at *3 (D. Del. May 4, 2009) (citing *Kehr*

*Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991)).

### C.    Rule 12(b)(6)

When a Court considers a Rule 12(b)(6) motion, it accepts as true the well-pleaded

allegations of the complaint, drawing all reasonable inferences in favor of the plaintiff.  *See Raul*,

929 F. Supp. 2d at 341.  As with review of a Rule 23.1 motion, a court reviewing a Rule 12(b)(6)

motion is not obligated to accept as true bald assertions, unsupported conclusions and

unwarranted inferences, or allegations that are self-evidently false.  *Id.*

## III.    DISCUSSION

With their Motion, Defendants make three arguments for dismissing the Complaint:  (1)

the Complaint should be dismissed for lack of subject matter jurisdiction; (2) the Complaint

lacks particularized allegations showing that demand is excused; and (3) the Complaint fails to

state a claim upon which relief may be granted.  (D.I. 10 at 6-29)  The Court will take up these

arguments in turn, addressing the first two in substantive fashion and the third only briefly.

### A.    Subject Matter Jurisdiction/Rule 12(b)(1)

Defendants first argument for dismissal is that the Complaint should be dismissed for

lack of subject matter jurisdiction, pursuant to Rule 12(b)(1).  Here, Defendants' argument takes

two different paths:  one relating to Count III, which is premised on federal question jurisdiction,

and one relating to Counts I and II, which are premised on diversity jurisdiction.

### 1.    Federal Question Jurisdiction/Count III

As to the first issue, Defendants argue that Plaintiff's contribution claim in Count III against Greco and Okray—the only claim as to which federal question jurisdiction is asserted—should be dismissed because that claim is not ripe.  (D.I. 10 at 6-8)  In Count III, Plaintiff notes that AAP is a named defendant in the Securities Action, and asserts that "[i]f AAP is ultimately found liable for violating the federal securities laws [in that case], the Company's liabilities will arise [due to] the acts or omissions of Greco and/or Okray" such that "[t]he Company is entitled to receive contribution [or indemnification] from those Defendants in connection with the Securities Action[.]"  (D.I. 1 at ¶¶ 233, 236)  The Court agrees with Defendants that this claim fails for lack of subject matter jurisdiction.

The existence of a case or controversy is a prerequisite to all federal actions.  *Peachlum v. City of York, Pa.*, 333 F.3d 429, 433 (3d Cir. 2003); *Angelo v. NVR, Inc.*, Civil Action No. 18-523-RGA, 2019 WL 1150565, at *5 (D. Del. Mar. 12, 2019).  Ripeness is a component of the case or controversy requirement.  Defendants' challenge to the ripeness of Count III is a facial challenge to subject matter jurisdiction.  *See Thompson v. Borough of Munhall*, 44 F. App'x 582, 583 (3d Cir. 2002); *Evanston Ins. Co. v. Layne Thomas Builders, Inc.*, 635 F. Supp. 2d 348, 352 (D. Del. 2009).

The ripeness doctrine asks whether a party has brought an action prematurely; it counsels abstention until such time when a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.  *Peachlum*, 333 F.3d at 433; *Angelo*, 2019 WL 1150565, at *5.  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citations omitted).  And thus, when a claimed injury is "'contingent upon the outcome of a separate, pending lawsuit,' courts generally 'dismiss claims

as premature.'" *Pall v. KPMG, LLP*, Civ. No. 3:03CV00842(AWT), 2006 WL 2800064, at *3 (D. Conn. Sept. 29, 2006) (citations omitted).

Here, Count III's contribution claim is brought pursuant to Section 10(b) of the Exchange Act, which provides for a "private right of action for contribution, and Section 21D of the [PSLRA, which] . . . governs the application of any private right for contribution asserted pursuant to the Exchange Act." *Lemon Bay Partners LLP v. Hammonds*, C.A. No. 05-327 GMS, 2007 WL 1830899, at *4 (D. Del. June 26, 2007). Under Section 21D, Plaintiff only has a right to contribution if "final judgment is entered" in the Securities Action against Greco, Okray and AAP, and if the trier of fact "specifically determines that [those Defendants] knowingly committed a violation of the securities laws." 15 U.S.C. § 78u-4(f)(2)(A). Thus, because Plaintiff is attempting to bring a contribution claim that is contingent upon a finding of liability in the related Securities Action, the "injury (and availability of a contribution claim) depends upon the results in the related action[], making the contribution claim not ripe." *Pall*, 2006 WL 2800064, at *3 (concluding that a contribution claim brought pursuant to Section 21D should be dismissed due to lack of ripeness); *see also In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1048-49 (N.D. Cal. 2009) (same, where final judgment had not yet been entered in the related case that formed the basis for the contribution claim). Underscoring this reality is the fact that if there is a settlement in the Securities Action, contribution claims against the settling parties would be barred. *Pall*, 2006 WL 2800064, at *3 (citing 15 U.S.C. § 78u-4(f)(7)); *see also* (D.I. 10 at 7 n.5).[3]

---

[3]    In arguing that his contribution claim should survive, Plaintiff cites mainly to cases that are factually inapposite, because they involved claims for contribution or equitable indemnity that were filed as crossclaims, counterclaims or third-party claims pursuant to Federal Rules of Civil Procedure 13 and 14. (D.I. 15 at 29 (citing *Hallam v. Gemini Ins. Co.*, CASE NO. 12-cv-2442-CAB (JLB), 2015 WL 11237479 (S.D. Cal. Apr. 8, 2015); *Siebert v. Gene Sec.*

For this reason, the Court recommends that Count III be dismissed without prejudice due to lack of subject matter jurisdiction.

### 2.    Diversity Jurisdiction/Counts I and II

Defendants also challenge Counts I and II on subject matter jurisdiction grounds.  (D.I. 10 at 9-10)  Plaintiff asserts that the Court has diversity jurisdiction over those counts.

Here, Defendants' argument has to do with the fact that AAP is a citizen of North Carolina.  Typically, because a derivative suit is asserted by a stockholder on behalf of a corporation, the corporation would be aligned as a plaintiff in the suit, as the corporation "is the real party in interest."  *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522-23 (1947); *see also Obstfeld v. Schwartz*, 621 F. Supp. 2d 87, 93 (S.D.N.Y. 2008).  If that were the case here, it would defeat diversity jurisdiction, because Defendant Greco is also a citizen of North Carolina.  (D.I. 10 at 10; D.I. 1 at ¶ 30)

However, the general rule about aligning the corporation as a plaintiff in a derivative case is subject to a key exception.  Where the corporation is antagonistic or adverse to the suit, the ordinary presumption bursts, and then the corporation should instead be aligned as a defendant; this is because in such a case, the plaintiff and the corporation are, in reality, on opposite sides of the controversy.  *See Doctor v. Harrington*, 196 U.S. 579, 587 (1905); *Gabriel v. Preble*, 396 F.3d 10, 14 (1st Cir. 2005).  A corporation is deemed adverse to a derivative suit when, regardless of the reason, the "corporation's management opposes maintenance of the action." *Gabriel*, 396 F.3d at 14 (citing *Smith v. Sperling*, 354 U.S. 91, 96-97 (1957)).  The Supreme

---

*Network, Inc.*, Case No. 11-cv-01987-JST, 2013 WL 5645309 (N.D. Cal. Oct. 16, 2013); and *NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1037 (E.D. Cal. 2013))  In other words, those claims were filed, pursuant to federal rules, in the very same action "in which liability [would] be determined."  *Pall*, 2006 WL 2800064, at *3.

Court of the United States has explained that a district court should "determine the issue of antagonism on the face of the pleadings and by the nature of the controversy." *Smith*, 354 U.S. at 96.

In their briefing, Defendants argued that AAP "has not received or refused a demand and is therefore not antagonistic" to Plaintiff's suit. (D.I. 10 at 10)  But that lack-of-antagonism argument is a pretty tough one to make here.  AAP is run by its Board and by its CEO.  Many of its Board members and its CEO are Defendants in this action, and they are alleged to have failed to act to prevent AAP from perpetrating a fraud on the public.  Not surprisingly, these Individual Defendants are fighting back hard against this suit; with the instant Motion, for example, they are strongly denying that the record suggests they have done anything like what Plaintiff claims. And AAP, which has appeared in this action and is represented by the same attorneys who are defending the Individual Defendants, has joined in the instant Motion.  (D.I. 9; Tr. at 31 (Defendants' counsel acknowledging that AAP is "taking a position" against the merit of Plaintiff's claims))

Such facts are surely sufficient to show that the corporation is adverse to Plaintiff.  *See Gabriel*, 396 F.3d at 15 (concluding that realigning a corporation as a defendant was appropriate, where the plaintiff pleaded that she did not ask the defendant officers/board members to take ameliorative action before filing suit because such a demand would be futile, and because the board-of-director defendants "fought the suit tooth and nail"); *see also Plunkett v. Poyner*, No. 08-60953-CIV., 2009 WL 5176542, at *3 (S.D. Fla. Dec. 22, 2009) ("Based on the allegations contained in the Complaint, the Court is satisfied that for purposes of deciding diversity jurisdiction, the Company, alleged to be controlled by Defendants, is antagonistic to the interests of Plaintiff and the other shareholders.  The Complaint is replete with allegations of fraud and

16

malfeasance perpetrated by the Defendants based on their control over the Company and its operations."). Perhaps for this reason, by the time of oral argument, even Defendants' counsel was not seriously contending anymore that AAP was not "antagonistic" toward this suit. (Tr. at 32-33 ("[Defendants' Counsel: ]I don't think it would be an error to find that the Court has diversity jurisdiction here.")).

AAP is thus properly aligned as a Defendant in this case. Therefore, the Court recommends that Defendants' Motion be denied to the extent it seeks dismissal of Counts I and II for lack of subject matter jurisdiction.[4]

## B. Demand Futility

Defendants next move to dismiss Plaintiff's claims for failure to sufficiently plead demand futility, pursuant to Rule 23.1. In addressing this issue, the Court will focus on the breach of fiduciary duty claim in Count I, understanding that if the allegations are wanting as to that Count, they will be wanting as to the other two.[5]

---

[4]     Because the Court concludes that this Court retains diversity jurisdiction over Counts I and II, it need not address Defendants' argument that the Court should decline to exercise jurisdiction over the entire case on the ground that the state law claims in Counts I and II "substantially predominate" over the federal contribution claim in Count III. (*See* D.I. 10 at 8-9; *see also* D.I. 15 at 28 n.28)

[5]     With regard to Plaintiff's unjust enrichment claim in Count II, that claim alleges that the failure of "oversight claim articulated in Count I had a secondary consequence of inflating the Company's financial results, leading to unjust enrichment for the [Individual Defendants] who were compensated based on" their breach of fiduciary duties. *Hughes v. Xiaoming Hu*, C.A. No. 2019-0112-JTL, 2020 WL 1987029, at *17 (Del. Ch. Apr. 27, 2020); *see also* (D.I. 1 at ¶¶ 226-30). Thus the "demand futility analysis for purposes of Count II [] treads the same path as the demand futility analysis for Count I[,]" because to "evaluate a demand to assert the claim posited in Count II, the Demand Board would have to investigate and then assert litigation based on the breaches of the duty of oversight that are the subject of Count I." *Hughes*, 2020 WL 1987029, at *18; *see also Smith ex rel. Zion Oil & Gas, Inc. v. Carrillo*, Civil Action No. 18-1399-RGA, 2019 WL 6328033, at *8 (D. Del. Nov. 26, 2019); *In re China Auto. Sys.*, 2013 WL 4672059, at *5. Thus, if the allegations as to demand futility are insufficient as to Count I, they will also be insufficient as to Count II.

To start, the Court will set out the additional legal standards that apply to its demand

futility analysis.  Then it will assess whether, pursuant to those standards, Plaintiff has

sufficiently pleaded demand futility with particularity.

### 1.    Applicable Legal Standards

To start, the Court concludes that the *Rales* test, not the test in *Aronson*, applies to this

case.  Again, the *Rales* test asks "whether or not the particularized factual allegations of [the

Complaint] create a reasonable doubt that, as of the time the [Complaint was] filed, the board of

directors could have properly exercised its independent and disinterested business judgment in

responding to a demand."  *Rales*, 634 A.2d at 934.

Relatedly, in the Court's view, Plaintiff's breach of fiduciary duty claim in Count I is a

so-called "*Caremark* claim":  a claim asserting that "'[D]efendants are liable for damages that

arise from a failure to properly monitor or oversee employee misconduct or violations of law.'"

*In re Chemed. Corp., S'holder Derivative Litig.*, Civil Action No. 13-1854-LPS-CJB

Consolidated Action, 2019 WL 3215852, at *10 (D. Del. Feb. 26, 2019) (quoting *Melbourne*

*Mun. Firefighters' Pension Tr. Fund v. Jacobs*, C.A. No. 10872-VCMR, 2016 WL 4076369, at

*7 (Del. Ch. Aug. 1, 2016)); *see also David B. Shaev Profit Sharing Acct. v. Armstrong*, No.

Civ.A. 1449-N., 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) (describing a *Caremark* claim

as one involving allegations that "the directors failed to act when they otherwise should have

done so"); *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996); (D.I. 10 at

---

With regard to the contribution claim in Count III, at least in Plaintiff's view, the
allegations of demand futility regarding Counts I and II are applicable to Count III.  (D.I. 15 at
17 n.15)  Defendants disagree, (D.I. 17 at 14-15 & n.13), but the Court need not resolve that
dispute.  Even assuming Plaintiff is correct, and Count III rises and falls with Counts I and II as
to the demand futility issue, in light of the Court's conclusion below, Count III would also be
subject to dismissal on this additional ground.

14).  To prevail on a *Caremark* claim, Plaintiff must demonstrate either that:  (1) "the directors utterly failed to implement any reporting or information system or controls"; or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  Under the second formulation of a *Caremark* claim, the one at issue here,[6] a plaintiff can state a valid claim by pleading:  (1) that the directors knew or should have known that the corporation was violating the law; (2) that the directors acted in bad faith by failing to prevent or remedy those violations; and (3) that such failure resulted in damage to the corporation.  *Melbourne*, 2016 WL 4076369, at *8.[7]  Pressing this type of *Caremark* claim requires "a showing that the directors *knew* they were not discharging their fiduciary obligations or that they demonstrated a *conscious* disregard for their duties."  *Intel*, 621 F. Supp. 2d at 174 (emphasis in original); *Citigroup*, 964 A.2d at 123.  "The test is rooted in concepts of bad faith; indeed, a showing of bad faith is a *necessary condition* to oversight liability."  *Citigroup*, 964 A.2d at 123 (emphasis in original).  Overall, this theory of liability has been said to be "'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'"  *Horman v. Abney*, C.A. No. 12290-VCS, 2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017) (citation omitted); *see also Intel*, 621 F. Supp. 2d at 174.

---

[6]      Plaintiff does not plead facts implicating the first *Caremark* prong.  Indeed, the Complaint "expressly acknowledges the existence of [B]oard-level monitoring and oversight systems at [AAP]."  *Behrmann v. Brandt*, Civil Action No. 19-772-RGA, 2020 WL 4432536, at *12 (D. Del. July 31, 2020), *report and recommendation adopted*, 2020 WL 5752389 (D. Del. Sep. 25, 2020); *see also* (D.I. 1 at ¶¶ 39-46, 220).

[7]      "[P]laintiffs often attempt to satisfy the elements of [this type of] a *Caremark* claim by pleading that the board had knowledge of certain 'red flags' including corporate misconduct and acted in bad faith by consciously disregarding its duty to address that misconduct."  *Melbourne*, 2016 WL 4076369, at *8.

In assessing the content of Plaintiff's Complaint, as well as Plaintiff's briefing and its counsel's statements at oral argument, it is clear to the Court that Count I should be analyzed pursuant to *Rales* and should be considered a *Caremark* claim.  This is because Count I is really focused on what the majority of the Demand Board *did not do* and how they *failed to prevent or remedy* violations of the law—not on *actions taken* by those persons.  The gravamen of the claim is that:  (1) by the time of the Spring 2017 Board Meeting, the Company's financial position coming out of the first quarter of 2017 was a "'disaster'"; (2) during the Spring 2017 Board Meeting, six of the Individual Defendant directors discussed this topic with Greco and Okray and "specifically asked" the two men if the Company should update its FY17 Guidance to account for this; (3) thereafter, the Company did not update the FY17 Guidance; (4) instead, on a May 24, 2017 conference call with investors and analysts, Greco and Okray made certain of the Potentially Actionable Statements, in which they expressed confidence in the FY17 Guidance, even though they knew that it was inaccurate and that its projections for 2017 would not come to pass; and (5) a majority of the Demand Board knowingly failed to do anything to stop Greco and Okray from making those May 2017 statements, and failed to cause the Company to clear up other Potentially Actionable Statements that Greco and Okray had made in the past.  (D.I. 1 at ¶ 28 ("[T]he Board specifically discussed with defendants Greco and Okray whether the company should issue revised, corrected guidance given the disastrous internal projections.  The Individual Defendants however, ultimately did not issue revised guidance."); *id*. at ¶ 165 (alleging that "no update [about the Company's poor financial prognosis for 2017] was provided at [the time of the Spring 2017 Board Meeting] or thereafter by the Individual Defendants to the public"); *id*. at ¶ 213 (alleging that "despite the Board's specific discussion as to whether updated guidance should be issued to the public, no updated guidance was issued at that time or thereafter"); *see*

*also* D.I. 10 at 15-21; D.I. 15 at 18-25)); *In re GoPro, Inc.*, CONSOLIDATED C.A. No. 2018-0784-JRS, 2020 WL 2036602, at *10 (Del. Ch. Apr. 28, 2010) ("Even if the Board were told by its management that the Company was not going to meet its revenue projections, and then did nothing as management publicly stood by its market guidance, that factual predicate would support a 'classic' *Caremark* claim[,] . . . not a claim against the Board for causing the Company to make false disclosures.").  Indeed, at one point in Plaintiff's briefing, Plaintiff confirmed that his theory here was that "a majority of AAP's directors at the time this Action was initiated face a substantial likelihood of liability for their *failure to affirmatively act*[.]"  (D.I. 15 at 19 (certain emphasis omitted, certain emphasis added))  And though at other points in his briefing, Plaintiff suggested that this might not be a *Caremark* claim, (D.I. 15 at 18-20), by the time of oral argument, Plaintiff's counsel was acknowledging "I think that the Court could call it a *Caremark* claim[,]" (Tr. at 44; *see also id.* at 43-44 (Plaintiff's counsel agreeing that the "gravamen" of its allegations are that "the board knew that what [Okray and] Greco was saying was wrong . . . and it just failed to do anything about that, it just let that happen, it didn't do anything"))

With the legal standard in *Rales* and the elements of a *Caremark* claim firmly in mind, then, the Court turns to whether Plaintiff has sufficiently pleaded demand futility.[8]

---

[8]     Defendants note that AAP's corporate charter (a document not referenced in or attached to the Complaint) expressly exculpates Board members from various forms of liability, with only certain limited exceptions.  (D.I. 10 at 12-13 (citing D.I. 11, ex. 5 at Art. VIII))  At times our Court has declined to take into account the existence of such a charter in resolving motions at the pleading stage.  *See, e.g.*, *Cavi v. Evolving Sys., Inc.*, C.A. NO. 15-1211-RGA/MPT, 2017 WL 658470, at *6 (D. Del. Feb. 17, 2017); *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 560-61 (D. Del. 2008).  That said, the Court is not sure why a court could not take judicial notice of such a document in that context.  *Cf. In re Tangoe, Inc. S'holders Litig.*, C.A. No. 2017-0650-JRS, 2018 WL 6074435, at *12 & n.79 (Del. Ch. Nov. 20, 2018).  In any event, the Court need not resolve the issue here, as the charter contains exceptions for, *inter alia*, breaches of the duty of loyalty, for acts or omissions not taken in good faith and for intentional or knowing violations of the law.  (D.I. 11, ex. 5 at

### 2.      Sufficiency of the Allegations

The Court has carefully reviewed the Complaint's allegations.  In doing so, it concludes that Plaintiff has not pleaded with particularity facts plausibly demonstrating that, at the time the Complaint was filed, there is a reasonable doubt that a majority of the Demand Board[9] could have properly exercised its independent and disinterested business judgment in responding to a demand.  *Rales*, 634 A.2d at 934.[10]  The Court comes to this conclusion for two primary reasons, set out below.

The first reason has to do with what is (and is not) alleged about what the seven Individual Defendants were told at the Spring 2017 Board Meeting regarding Company financial projections or forecasts (hereafter, "projections") for the remainder of 2017.  Plaintiff's argument for denial of the Motion as to demand futility relies heavily on the suggestion that as of the

---

Art. VIII)  All of these are at issue in Count I, and in light of the Court's decision herein to recommend dismissal of the Count, the charter issue is not determinative.

[9]      Of the 11 members of the Demand Board, four (Jones, McCollam, Pertz and Travis) are not at issue here, as they are not Defendants in this suit and Plaintiff does not argue their interestedness or lack of independence.  (D.I. 10 at 13-14)  The analysis then focuses on the seven Individual Defendants.

[10]      It is worth noting, in light of Plaintiff's theory, that the first four of the Potentially Actionable Statements were issued or made in November 2016 and February 2017, well before the Spring 2017 Board Meeting.  Because Plaintiff's theory is that only in light of the events occurring at the Spring 2017 Board Meeting should the seven individual Defendants have known that the FY17 Guidance was faulty, Plaintiff cannot be asserting that these Defendants should have stopped these November 2016 or February 2017 statements from occurring in the first place.  Plaintiff's argument instead is that after the Spring 2017 Board Meeting, these Defendants should have taken some action to publicly contradict or disavow these prior statements.  (D.I. 10 at 17; Tr. at 39)  Defendants assert that the seven Individual Defendants cannot be liable for this failure to act, as "there is no obligation under the securities laws to update projections, even when they will not be met."  (D.I. 10 at 17)  However, the Court need not further address this issue, in light of its decision herein (i.e., to the effect that Plaintiff has not sufficiently pleaded that the Board knew or should have known that there was anything that needed correcting).

Spring 2017 Board Meeting, these Defendants knew that the previously-issued FY17 Guidance

was "unattainable" because that guidance "directly contradicted *contemporaneous internal*

*forecasts*" for the Company's 2017 fiscal performance.  (D.I. 1 at ¶ 2 (emphasis added))  As the

basis for this allegation, Plaintiff acknowledges that he is relying wholly on what is pleaded in

the Securities Action Complaint regarding FE 8 (who, according to that pleading, was either

present at the Spring 2017 Board Meeting or somehow knows what was said there).[11]  (Tr. at 52-

53; *see also* Securities Action, D.I. 46 at ¶ 152 ("During the Board meeting, according to FE 8 . .

."))  And in Plaintiff's Complaint, he goes on to make these additional allegations about such

projections:

> (1) "[A]ccording to the [] confidential witness account provided by
> FE 8, this prompted a Board meeting during which the Board
> specifically discussed with [D]efendants Greco and Okray
> whether the company should issue revised, corrected guidance
> *given the disastrous internal projections*."  (D.I. 1 at ¶ 28
> (emphasis added));
>
> (2) "FE 8 is the same confidential witness whose account included
> the revelation of [the Spring 2017 Board Meeting, which was
> held] due to the Company's *disastrous internal forecasts*,
> during which the topic of updating the Company's FY17
> [G]uidance was specifically raised by the Board and discussed
> with [D]efendants Greco and Okray[.]"  (*Id.* at ¶ 34 (emphasis
> added));
>
> (3) "FE 8 is the same confidential witness whose account in the
> Securities Complaint included the revelation of a Board
> meeting held in the Spring of 2017, *prompted by disastrous
> internal forecasts*, during which the topic of updating the
> Company's FY17 [G]uidance was specifically raised and

---

[11]     Defendants assert that it was *de facto* improper for Plaintiff to rely on FE 8's
allegations, because FE 8 is a confidential witness and Plaintiff or his attorneys have never
spoken to FE 8.  (D.I. 10 at 15-16; Tr. at 20)  The Court doubts that is correct as a categorical
matter, (D.I. 15 at 21-22 (citing cases)), but in any event, it need not decide the issue.  Even
taking into account Plaintiff's allegations regarding FE 8 (which, in turn, are premised on the
allegations found in the Securities Action Complaint), Count I cannot survive.

discussed by the Board with [D]efendants Greco and Okray."
(*Id.* at ¶ 203 (emphasis added)); and

(4) Alleging that demand is excused "in light of the allegations []
regarding a Board meeting held in or around March 2017,
*prompted by disastrous internal forecasts*, during which the
Board specifically discussed whether to issue corrected
guidance to the public, and then failed to do so."  (*Id.* at ¶ 213
(emphasis added))

If Plaintiff had pleaded with particularity that a majority of the Demand Board were

presented with internal company projections (either at the Spring 2017 Board Meeting or

otherwise) showing that the Company would not accomplish the goals set out in its FY17

Guidance, but then sat by while Greco and Okray made public statements contradicting those

internal projections, Plaintiff's claim might be viable.  (*See* Tr. at 22-23)  But the problem for

Plaintiff is that what he alleges about these projections is admittedly drawn only from the

Securities Action Complaint (and its allegations about FE 8).  (Tr. at 52-53)  Yet in the Securities

Action Complaint, it is *never alleged* that the seven Individual Defendants were presented with

these projections.  (D.I.10 at 16-17; D.I. 17 at 7-8, 12; Tr. at 20-21, 49)  Indeed, the allegation in

the Securities Action Complaint that relates to FE 8 and the Spring 2017 Board Meeting is as

follows:

> No later than mid-March 2017, FE 8 said the "shit hit the fan."
> The financial situation coming out of 1Q17 was a "disaster,"
> prompting a Board meeting.[]  At the time, according to FE 8,
> AAP had missed 1Q17's sales AOP by $25-$30 million, and was
> approximately $20 million behind plan for 2Q17.  FE 5's territory
> alone—which included parts of Ohio, Pennsylvania and New
> York—was $20 million below AOP going into March 2017.
> During the Board meeting, according to FE 8, the Board
> specifically asked Greco and Okray if they wished to update the
> Company's forecast.  They declined.

(Securities Action, D.I. 46 at ¶ 152 (emphasis omitted); *see also* Defendants' Hearing

Presentation, Slide 17)  Nowhere in that paragraph is a specific allegation that the Board was

24

provided with projections showing that the Company would not hit the marks set by its FY17 Guidance. And so in light of this, the instant Complaint cannot be understood to allege that the seven Individual Defendants were actually provided with such dismal projections, and then did nothing while the Company publicly promoted much rosier ones.[12]

The Court now turns to the second reason prompting a recommendation of dismissal: that absent any allegation that a majority of the Demand Board were presented with the above-referenced negative 2017 projections, the Complaint does not sufficiently allege that these Defendants knew the Potentially Actionable Statements were false. To be sure, the Complaint does repeatedly assert that AAP's first quarter 2017 financial results were a "'disaster'" in that the Company had missed its "sales AOP by $25-$30 million, and was approximately $20 million behind plan for 2Q17." (D.I. 1 at ¶ 165 (emphasis omitted)) But the Complaint never clearly states that a majority of the Demand Board were actually provided with this information (during the Spring 2017 Board Meeting or otherwise).[13]

---

[12]     At oral argument, Plaintiff's counsel argued that, in light of the fact that FE 8 had reported that AAP's first quarter 2017 financial situation was a "disaster" and because FE 8 was a senior AAP executive who personally prepared such forecasts, "the only reasonable inference is that those forecasts were the subject of [the Spring 2017 B]oard [M]eeting" and that there is "no reason to infer that the board meeting would have only dealt with the financial results from the first quarter." (Tr. at 57-58) But in the Court's view, that argument elides the Plaintiff's responsibility to plead facts that excuse demand *with particularity*. (*Id*. at 50); *see also Horman*, 2017 WL 242571, at *12 ("Even reasonable inferences must logically flow from particularized facts alleged by the plaintiff.") (internal quotation marks and citation omitted). If after reading Plaintiff's allegations, the Court has no idea if the seven Individual Defendants were ever provided with certain key information, how could the Court conclude that Plaintiff has pleaded with particularity that they were?

[13]     Defendants' counsel noted that since the Spring 2017 Board Meeting is alleged to have occurred in or around March 2017, (D.I. 1 at ¶ 213), Plaintiff's suggestion that the seven Individual Defendants were told at that meeting that the Company was "$20 million behind plan" for the second quarter does not make much sense. (Tr. at 74-75) As of March 2017, the second quarter would not yet have even begun. (*Id.*)

Plaintiff argues to the contrary.  He asserts that the seven Individual Defendants *were* told about this "$20 million behind plan" status in the relevant time frame.  In support, he again relies on the Complaint's allegations regarding FE 8.  (Tr. at 57-58)  But again, those allegations are premised on *what is in the Securities Action Complaint*, and that pleading does *not* assert that the Individual Defendants were provided with this information.  Instead, the Securities Action Complaint alleges only that:  "[a]t the time [of the Spring 2017 Board Meeting], according to FE 8, AAP had missed 1Q17's sales AOP by $25-$30 million, and was approximately $20 million behind plan for 2Q17."  (Securities Action, D.I. 46 at ¶ 152 (emphasis omitted))  If what Plaintiff means to allege is that the seven Individual Defendants *were told about these facts* at the meeting, then he needs to actually plead those facts *with particularity*.  *Cf. Kanter v. Barella*, 489 F.3d 170, 175-76 (3d Cir. 2007) (noting that Rule 23.1's requirement that facts be pleaded with particularity is akin to pleading the "who, what, when, where, and how" of the events at issue) (internal quotation marks and citation omitted); *Lieblein v. Ersek*, Civil Action No. 14-cv-00144-MSK-KLM,  2017 WL 4337719, at *3 (D. Colo. Sept. 29, 2017) (same).

Nevertheless, even if the Court were to assume that the seven Individual Defendants were told this information at the Spring 2017 Board Meeting, there is another problem with the Complaint's allegations:  the Complaint alleges almost nothing about *what else actually happened* at that meeting.  We know from the Complaint that "according to FE 8, the Board specifically asked [] Greco and Okray if they wished to update the Company's forecast" and "[t]hey [i.e., Greco and Okray] declined[.]"  (D.I. 1 at ¶ 165 (emphasis omitted))  But why did they decline?  Was it because they told the Board that the FY17 Guidance did not need any updating, since AAP's financial situation would very strongly rebound later in the year?  Did they present the Board with slides or briefing materials to that effect?  Or was it because Greco

and Okray said that while achieving the FY17 Guidance markers would be difficult, they thought the Company would end 2017 just over the projected line?  Was it due to some other reason?  The reader is left in the dark as to the answers to those questions.  And yet those answers are exactly what would shed light on the seven Individual Defendants' mindset at the time—i.e., about whether they knew or consciously disregarded the reality that the Company would not meet the projection set out in its FY17 Guidance.  (Tr. at 59-60)  Because they lack this detail, Plaintiff's allegations are not an example of pleading with particularity.  Instead, they amount to pleading with ambiguity.  *Cf. In re GoPro*, 2020 WL 2036602, at *14 (concluding that plaintiffs had not sufficiently pleaded a *Caremark* claim, where plaintiffs alleged that the demand board allowed, ignored or encouraged numerous materially false and misleading statements by certain officer defendants regarding the company's 2016 revenue projections and its new drone product, even though the complaint asserted that the demand board had been presented with slides indicating that there were delays with the product that would cause "'risk'" as to future revenue, because, *inter alia*, "[n]othing about these slides supports a reasonable inference the Board knew the Company would miss its guidance or consciously disregarded risk" and that "at best, [the slides] show the Board was making a good faith effort to monitor [the company's] business risk as [the product's] production continued" (emphasis omitted)).[14]

---

[14]       Nor are there sufficient facts pleaded to allow the Court to infer that:  (1) if the seven Individual Defendants knew as of the Spring 2017 Board Meeting that the Company was "approximately $20 million behind plan for 2Q17[,]" then (2) they *had to know* that the Company could not meet its FY17 Guidance by year's end.  (Tr. at 34 (Plaintiff's counsel referring to this as a "critical allegation"); *see also id*. at 68-69 (Defendants' counsel arguing that an indication that AAP was "$20 million behind plan" for a quarter would not be particularly insightful about AAP's end-of-year 2017 prospects, in light of the fact that AAP has an annual revenue of $8-9 billion))

It is not as if it would have been impossible for Plaintiff to obtain some of the missing key details.  If FE 8 knew what was said at the Spring 2017 Board meeting, then Plaintiff's counsel could have at least made an attempt to interview him.  Perhaps more promisingly, Plaintiff could have made a books and records request pursuant to Section 220 of the Delaware General Corporate Law, in order to find out more about what was discussed at the meeting or at other 2017 AAP Board meetings.  *See In re Chemed Corp.*, 2019 WL 3215852, at *4, *14-16; *Freeman ex rel. Tesla, Inc. v. Musk*, 324 F.R.D. 73, 82-83 (D. Del. 2018); *see also* (Tr. at 69-70).  But he did not do so here.

For these reasons, the demand futility allegations in the Complaint are insufficient as to Counts I (and Counts II and III).[15]  Therefore, the Court recommends that those Counts be dismissed pursuant to Rule 23.1.[16]

---

[15]     Although the Court here has analyzed these counts under a *Caremark* claim rubric, the outcome would not be different if the claims were analyzed as false disclosure claims. As to the false disclosure theory, "[w]henever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); *see also In re GoPro*, 2020 WL 2036602, at *10. Thus, a board member will be held liable for breach of fiduciary duty if the he or she intentionally misleads stockholders with regard to such communications. *Malone*, 722 A.2d at 14; *see also In re GoPro*, 2020 WL 2036602, at *10. Directors who knowingly make materially misleading statements "may be considered to be interested for the purposes of demand." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 991 (Del. Ch. 2007); *see also In re GoPro*, 2020 WL 2036602, at *10. To plead a claim of false disclosure where there is no request for stockholder action, "[P]laintiff must allege that the directors deliberately misinform[ed] shareholders about the business of the corporation, either directly or by public statement." *Ellis v. Gonzalez*, C.A. No. 2017-0342-SG, 2018 WL 3360816, at *7 (Del. Ch. July 10, 2018) (internal quotation marks and citation omitted).

Here, there simply are not particularized allegations to support a false disclosure claim as to a majority of the Demand Board. Only one member of the Demand Board (Greco) is alleged to have personally made any of the Potentially Actionable Statements (he is alleged to have made four of the eight statements). (D.I. 1 at ¶¶ 33, 202; D.I. 10 at 20, 22; D.I. 17 at 10-11; Tr. at 19) Three of the other four statements are attributed to Okray, who is not a member of the Demand Board. The last statement is a February 21, 2017 Company press release, which predates the Spring 2017 Board Meeting; the Complaint contains no particularized allegation that any of the seven Individual Directors had a hand in drafting or releasing that press release. And in addition to the fact that Plaintiff does not plead that any of the Demand Board (other than Greco) made these statements, Plaintiff also does not sufficiently allege facts suggesting that those Defendants otherwise encouraged that the statements be made. *See GoPro*, 2020 WL 2036602, at *10-11 (noting, in alternatively assessing the claims therein as false disclosure claims, that demand futility had not been sufficiently pleaded, due to the lack of "some particularized facts that would show the board was actually affirmatively saying to management, 'yes, keep telling the market that we're going to meet our revenue guidance, notwithstanding these production issues that we're having'") (certain internal quotation marks and citation omitted).

[16]     Because Plaintiff has failed to sufficiently plead demand futility for the reasons set out above, the Court need not reach Defendants' alternative arguments as to why the counts should be dismissed pursuant to Rule 12(b)(6). *N.J. Bldg. Laborers Pension Fund v. Ball*, Civil Action No. 11-1153-LPS-SRF, 2014 WL 1018210, at *2 n.3 (D. Del. Mar. 13, 2014); *Abrams v.*

IV.     **CONCLUSION**

For the foregoing reasons, the Court recommends that the Motion be GRANTED-IN-PART and DENIED-IN-PART.  More specifically, the Court recommends that the Motion be GRANTED in that:  (1) Counts I-III should be dismissed for failure to sufficiently plead demand futility, pursuant to Rule 23.1; and (2) Count III should also be dismissed for lack of subject matter jurisdiction.  The Court recommends that the Motion be DENIED to the extent it asserts that Counts I and II should be dismissed for lack of subject matter jurisdiction.  And it recommends that the Motion be DENIED as MOOT in all other respects.

Plaintiff sought the opportunity to amend its claims were they dismissed.  (D.I. 15 at 30 n.30)  Amendment would not be appropriate with regard to Count III at this stage, in light of the subject matter jurisdiction issue discussed above.  But as to Counts I and II, because it is not clear to the Court that allowing the opportunity to amend would be a futile act, because this is the first time the Court has found Plaintiff's claims to be deficiently pleaded, and because leave to amend should be given freely "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court also recommends that dismissal of the claims be without prejudice, and that, to the extent that the District Court affirms the Court's recommendation, Plaintiff be given leave to file a further amended complaint addressing the deficiencies regarding Counts I and II within 14 days. *TriDiNetworks Ltd. v. Signify N. Am. Corp.*, Civil Action No. 19-1063-CFC-CJB, 2020 WL 2839224, at *5 (D. Del. June 1, 2020).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

---

*Wainscott*, Civil Action No. 1-297-RGA, 2012 WL 3614638, at *4 (D. Del. Aug. 21, 2012); *see also* (D.I. 10 at 26-28).

Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the

loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x

924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.

Dated:  January 31, 2021

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE